FILED
United States Court of Appeals
Tenth Circuit

August 7, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JENNIFER COUTURE, individually
and as mother and next friend of M.C.,
a minor child,

Plaintiff-Appellee,

v.

BOARD OF EDUCATION OF THE
ALBUQUERQUE PUBLIC
SCHOOLS, PAT WILLIS, JOE
FLIPPO and JACQUELINE BRADY,

Defendants-Appellants.

No. 07-2133

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. NO. 05-CV-972-JH)**

---

Brian K. Nichols, (Michael L. Carrico, with him on the briefs), Modrall, Sperling,
Roehl, Harris & Sisk, P.A., Albuquerque, New Mexico, for Defendants-
Appellants.

Gail Stewart, (Laurel Nesbitt, with her on the briefs), Steven Granberg, P.A.,
Albuquerque, New Mexico, for Plaintiff-Appellee.

---

Before **McCONNELL**, **SEYMOUR** and **GORSUCH**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

---

The plaintiff in this case, M.C.,[1] is a young child who suffers from severe emotional and mental health problems. During the relevant time period these problems manifested themselves in repeated outbursts in which he threatened, and at times assaulted, teachers and students. In 2002, when he was six years old, he was placed in a special education program at the Governor Bent Elementary School. School officials worked with his mother, Jennifer Couture, to develop an Individualized Education Plan (IEP). The plan included a "behavior management system" designed to teach M.C. to control his dangerous outbursts. In addition to implementing clear and strict rules, the system permitted teachers to place M.C. in supervised timeouts when his behavior became disruptive.

Despite the small class size and personal attention M.C. received, his behavior did not improve, and, at times, it deteriorated. M.C. frequently interrupted class and often made it impossible for the teachers to instruct the other students. When they could not control his behavior, the teachers placed him in timeout until he calmed down for a period of at least five minutes. The appropriateness of these timeouts, and the characteristics of the timeout room, are the central issues in this suit.

Ms. Couture brought suit under 42 U.S.C. § 1983, individually and on behalf of M.C., against the Board of Education of Albuquerque Public Schools (APS), Ms. Brady (the teacher), Mr. Flippo (the principal), and Ms. Willis, (the

---

[1] We refer to the plaintiff as M.C. to protect the child's privacy.

school psychologist).  In addition to other claims not before us today, she argued that the defendants' use of the timeout room violated M.C.'s Fourth Amendment right against unreasonable seizures and his Fourteenth Amendment right to procedural and substantive due process.  The three individual defendants filed a motion contending that they were entitled to qualified immunity, which the district court denied.  We disagree with the district court and find that qualified immunity protects all three individuals from liability.  We reverse the decision of the district court and remand for dismissal on the Fourth and Fourteenth Amendment claims.

## I. Facts

Following a difficult turn in a public school kindergarten classroom and a rocky start to first grade, the Albuquerque Public School system determined that M.C. was "emotionally disturbed" and therefore eligible for special educational services.  In October of 2002, his mother, Ms. Jennifer Couture, met with a multidisciplinary team composed of APS officials to develop M.C.'s Individualized Educational Plan (IEP).  This document, a product of consultation between the student's family and experienced professionals at the school, established the blueprint for his education, and must be followed by the student's teachers and educational assistants.  At the meeting, the team identified some of the problematic behavior he displayed:

M.C. is defiant, uncooperative, argumentative, and aggressive. He throws things, does not do what is asked of him, sits under the table, plays with inappropriate things, isolates himself, and cuts up things. . . . M.C. is inattentive, has poor peer relations, argues, and is oppositional. M.C. is continually defiant; he tries his best to be oppositional . . . . M.C.'s first grade teacher reports the following specific behaviors of concern: defiance, angry aggression, lack of attention, lack of interest, and unhappiness. . . The children stay away from him with some children being scared. He cannot sit at tables with other children because he talks, bothers them, and

threatens other children.

*Id*. at 466. To address these concerns and to "help [M.C.] receive an appropriate education," the team formulated a "Behavior Intervention Plan" IEP targeted toward improving M.C.'s behavior, social skills, and academics. *Id*. The teachers were to establish "clear rules with consistent implementation of consequences, home/school communication, *supervised time out*, and therapeutic deescalation techniques by trained personnel." *Id*. (emphasis added). The teachers also agreed to report home to Ms. Couture daily. Ms. Couture signed that she "agree[d] with the recommendations of the Individualized Education Program Team and [gave] permission for [her] child to receive the recommended services." *Id*. at 473.

On October 28, 2002, M.C. was placed in Ms. Jacqueline Brady's special education classroom in the Governor Bent Elementary School. The classroom had no more than eight students in it at a time, but M.C. still received special, one-on-one attention from educational assistant Wendy Orr. Despite the instructors' use of both positive reinforcement techniques and intervention tools such as rewards,

"ignoring misbehavior, visual contact, verbal comments, warnings, physical proximity, talking with [M.C.], and touching," M.C. continued to struggle with his anger management problems. App. 589. Ms. Brady reported that "[e]very day [M.C.] would mock and mimic other children." *Id*. He frequently used profanity. He threatened to kill other children, "hit or kicked his chair," and "regularly shoved his desk against the wall." *Id*. at 590. He also threatened his teachers, yelling things such as: "You're dead. I'm going to kill you. I'm going to throw hot oil on you and kill you." App. 596; District Ct. Op. at 3. Occasionally, he engaged in physical violence, for example punching the assistant in the stomach and kicking her in the shin. App. 597. Unsurprisingly, this behavior had an adverse effect on the rest of the students.

Because the interventions and positive reinforcement techniques failed, and in accordance with the prescription of "supervised time out" as part of M.C.'s Behavioral Intervention Plan, Ms. Brady used timeouts to help M.C. calm down. When M.C.'s behavior became disruptive, Ms. Brady or Ms. Orr would ask him whether he needed a timeout at his desk, in the timeout chair, or in the timeout room. These strategies sometimes worked. Self-timeouts was not always effective, however, and the teachers often had to force M.C. into the timeout room if he "bec[a]me violent, a threat to himself or to others," or if he demonstrated "[a]ggressive behavior either to himself . . . or aggressiveness toward other children . . . ." Dist. Ct. Op. at 4. In addition to using the timeout

room as a deescalation technique, the teachers occasionally placed M.C. in it when he was not "following directions to begin work . . . ." *Id.* To be released from the timeout room, M.C. had to remain calm and silent for five minutes. Sometimes M.C. immediately calmed down, but often his behavior grew worse in the timeout room, and he would scream and kick or throw himself against the door. Dist. Ct. Op. at 7. The teachers often had to hold the door shut. Ms. Couture received daily reports documenting M.C.'s day; these reports contained some, but not all, of the factual details of the timeouts.

Ms. Couture eventually saw the timeout room while visiting the classroom. She described it as "very small" with "carpeting, but no padding on the walls. Nothing in it. Just carpet on the floor. It had a very dim light. There was black construction paper over the window, completely covering the window. You could not see in there unless you either moved the paper or took it off the window." App. 259. The district court's summary of the factual record is more nuanced: while at times, the teachers covered the window so that M.C. could not "antagonize" teachers and students through it and barricaded the door to prevent M.C. from shoving his way out of the room, generally, the timeout room complied with the standards set forth by the Albuquerque Public Schools. Dist. Ct. Op. at 5–6. "The room was lighted and empty, the room did not have a lock on the door, and teaching staff were able to see into the room through a shatter-proof window in the door." *Id.* at 5.

-6-

On November 19, 2004, Ms. Couture initiated an administrative action pursuant to the Individuals with Disabilities Education Act (IDEA) against the Albuquerque Public Schools and the defendants, in both their official and individual capacities.[2]  The complaint is not entirely clear as to which claims applied to which defendants, but it asserted violations under section 504 of the Rehabilitation Act, 29 U.S.C. § 794, the IDEA, 20 U.S.C. §§ 1400–1482, and Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132.  Ms. Couture claimed that M.C. was denied a free appropriate education (FAPE), and was discriminated against on the basis of a disability, because the defendants failed to: (1) consider M.C.'s eligibility as a student with a specific learning disability; (2) document the decision not to classify him as a student with a learning disability; (3) provide special education consistent with the existence of a learning disability; and (4) write or implement an IEP reasonably calculated to meet M.C.'s needs as a child with a disability.  Pertinent to this appeal, she also claimed that the district discriminated against M.C. by "[s]anctioning or ignoring ongoing inappropriate reliance upon timeouts and physical restraint as strategies in an educational setting when such strategies would not be tolerated if directed at

---

[2] Ms. Couture also brought claims under theories of supervisory liability against two additional defendants who are not parties to this appeal:  Elizabeth Everitt, the superintendent of the Albuquerque Public Schools, and Debi Hines, the director of special education for the Albuquerque Public Schools.  The district court, however, granted summary judgment for Everitt and Hines on qualified immunity grounds on March 15, 2007.  Dist. Dkt. Doc. 127.

non-disabled children." App. 484. Because she was moving out of the district, the hearing officer limited evidence to that pertinent to compensatory relief. *Id.* at 482–83.

The Due Process Hearing Officer (DPHO) held a three day hearing. He found no evidence of inadequate instruction or a denial of a FAPE, and no evidence of discrimination or exclusion from participation in the educational process. App. 503. While acknowledging that not all of the defendants' techniques were successful, he found that "[r]espondent provided the student with an array of appropriate interventions, supports, and services . . . that were individually designed to meet his needs . . . ." App. 505. "The lack of any spectacular level of success was not due to any lack of trying on the part of the staff, nor was it caused by any failure on the part of the district to meet legal requirements or to apply the expected level of professional educational acumen[]." *Id.* The DPHO denied all of petitioner's claims and dismissed them with prejudice.

Ms. Couture appealed this decision to the Federal District Court of New Mexico. She added several claims against defendant Brady, M.C.'s classroom teacher, in her individual capacity, under 18 U.S.C. § 1983 for violations of M.C.'s: (1) right to be free from unreasonable seizures pursuant to the Fourth Amendment; (2) procedural due process rights; and (3) substantive due process

-8-

rights.[3]  She filed these same claims against defendants Flippo and Willis, M.C.'s

principal and school psychologist, under a theory of supervisory liability.  She

also sued the three educators in their official capacities.  Ms. Brady, Mr. Flippo,

and Ms. Willis moved for summary judgment on qualified immunity grounds.

The district court denied summary judgment on all but the substantive due process

claim, holding that the plaintiff's facts, if true, demonstrated that Ms. Brady

violated M.C.'s clearly established rights when she seized him and placed him in

a "closet-like" timeout room without proper procedures.  It granted summary

judgment on the substantive due process claim because the "same conduct alleged

by Plaintiff as a violation of substantive due process is covered by the Fourth

Amendment's prohibition against unreasonable seizures."  App. 214, 245 (citing

*Graham v. Connor*, 490 U.S. 386, 394 (1989)).

This interlocutory appeal followed.  Viewing the facts in the light most

favorable to the plaintiff, as we must, we hold that the individual defendants did

not violate M.C.'s Fourth Amendment right against unreasonable seizures or his

Fourteenth Amendment procedural due process rights and are therefore entitled to

qualified immunity.

---

[3] Ms. Couture also raised several state law tort and common law claims, as well as an alleged violation of M.S.'s Fourteenth Amendment equal protection rights.  None of these are at issue here.

## II. Jurisdiction and Standard of Review

We have jurisdiction to review the denial of summary judgment on qualified immunity under 28 U.S.C. § 1291. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). "Orders denying qualified immunity before trial are appealable only to the extent they resolve abstract issues of law." *Shrum v. City of Coweta*, 449 F.3d 1132, 1137 (10th Cir. 2006) (citing *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996)). When the question is whether there is sufficient evidence or whether the district court's findings with respect to a genuine issue of material fact are correct, an interlocutory appeal is improper. *Id.* (citing *Johnson v. Jones*, 515 U.S. 304, 313 (1995)). A fact is material if the "resolution might affect the outcome of the case under governing law." *Linbrugger v. Abercia*, 363 F.3d 537, 541 (5th Cir. 2004).

Whether a seizure was "reasonable" is a question of law reviewable on interlocutory appeal. *See Doe v. Bagan*, 41 F.3d 571, 574–75 n.3 (10th Cir. 1994). Accepting the district court's interpretations of the plaintiff's evidentiary proffers, we must determine whether those facts render the seizures unreasonable under the Fourth Amendment. *Johnson v. Martin,* 195 F.3d 1208, 1214 (10th Cir. 1999); *see also Blossom v. Yarbrough*, 429 F.3d 963, 967 (10th Cir. 2005).

We conclude that, on this summary judgment record, the individual defendants did not violate M.C.'s Fourth Amendment right against unreasonable seizures or his Fourteenth Amendment procedural due process rights. It is

therefore unnecessary to reach the second part of the *Saucier* inquiry: whether those rights were clearly established at the time. *Saucier v. Katz*, 533 U.S. 194, 200 (2001).[4] We have no jurisdiction to review the substantive due process claim, which was resolved in favor of the defendants and has not been appealed. Other legal claims and claims against other parties, including the plaintiff's challenges under the IDEA, ADA, and Rehabilitation Act, which are not subject to interlocutory review, are not resolved by this appeal.

### III. Fourth Amendment Claim

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., Amend, IV. Contrary to early intimations in Supreme Court decisions, *see Ingraham v. Wright*, 430 U.S. 651, 673–74 n. 42 (1977), the Amendment is now understood to apply within the school setting, and it is not limited to actions taken for law enforcement purposes. *New Jersey v. T.L.O.*, 469 U.S. 325, 336–37 (1985); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1204-06 (10th Cir. 2003). But the setting and the purpose of actions undertaken outside the typical law enforcement context profoundly affect their reasonableness. *See Hazelwood School Dist. v. Kuhlmeier*,

---

[4] The Supreme Court has granted certiorari to decide "[w]hether the Court's decision in *Saucier v. Katz* should be overruled." *Pearson v. Callahan*, 128 S. Ct. 1702 (2008) (internal quotation marks and citations omitted), granting cert. in *Callahan v. Millard County*, 494 F.3d 891 (10th Cir. 2007).

-11-

484 U.S. 260, 266 (1988) (the rights of students "must be 'applied in light of the special characteristics of the school environment'" (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969))).  The requirement that police have probable cause before conducting a seizure, for example, does not apply in schools; the Court has held that such a standard "would unduly interfere with the maintenance of the swift and informal disciplinary procedures [that are] needed." *Board of Educ. of Indep. School Dist. No. 92 of Pottawatomie County v. Earls*, 536 U.S. 822, 828–29 (2002) (quoting *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995) (further citations omitted)).  To balance the students' privacy rights with the "schools' custodial and tutelary responsibility for children," *Pottawatomie County*, 536 U.S. at 829–30, a seizure need only be "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place." *Edwards v. Rees,* 883 F.2d 882, 884 (10th Cir. 1989) (quoting *T.L.O.*, 469 U.S. at 341).  Ms. Couture argues that the defendants violated M.C.'s Fourth Amendment rights when they repeatedly placed him in the timeout room.

### A. Seizure

The first step in our analysis is ordinarily to determine whether there was a seizure under the Fourth Amendment.  A seizure occurs when "a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988).  We must think about seizures differently

in the school context, as students are generally not at liberty to leave the school building when they wish. *See Vernonia School Dist.*, 515 U.S. at 654 ("[U]nemancipated minors lack some of the most fundamental rights of self-determination—including even the right to come and go at will."); *Wallace v. Batavia School Dist. 101*, 68 F.3d 1010, 1013 (7th Cir. 1995) ("[L]aw compels students to attend school, which deprives them of a level of freedom of mobility. Once under the control of the school, students' movement and location are subject to the ordering and direction of teachers and administrators."). To qualify as a seizure in the school context, the limitation on the student's freedom of movement must significantly exceed that inherent in every-day, compulsory attendance.

M.C. was certainly subject to greater restrictions than are most students. As the district court found, M.C. was at times physically carried into the timeout room, where teachers shut and barricaded the door. His requests for release from the room were consistently denied. On the other hand, the defendants maintain that the timeouts cannot legally be regarded as seizures for purposes of the Fourth Amendment because they are employed as educational techniques and were consented to as part of M.C.'s IEP. We need not resolve this issue because, even assuming the timeouts were seizures, they were not unreasonable. For the remainder of this opinion, we will assume without deciding that the timeouts were seizures.

## B. Reasonableness of the Seizure

The more difficult question is whether the seizure was unreasonable. While we accept the district court's assessment of the factual record, including whether there exist any genuine disputed issues of material fact, *see Johnson v. Jones*, 515 U.S. 304, 316–18 (1995), "reasonableness" is a question of law, which we review de novo. *Mecham v. Frazier*, 500 F.3d 1200, 1203–04 (10th Cir. 2007) (citing *Medina v. Cram*, 252 F.3d 1124, 1131 (10th Cir. 2001)). Context is critical to reasonableness analysis: a seizure may be reasonable to break-up an on-going fight, *see Wallace*, 68 F.3d at 1015, but it may be unreasonable ten hours after the fight occurred. We emphasize that our function here is to evaluate whether the educators transgressed constitutional limits on their treatment of M.C., not whether their action comported with proper educational policy. The Fourth Amendment sets outer boundaries for official conduct. It does not empower federal courts to displace educational authorities regarding the formulation and enforcement of pedagogical norms. The plaintiff has raised various claims relating to the appropriateness of the school's approach toward M.C. under relevant federal statutes, and those claims remain pending in district court. We do not resolve them here.

We are sympathetic to Ms. Couture's concern over the repeated use of the timeout rooms, which (at least in retrospect) did not seem to ameliorate her son's behavior. But we cannot find that there was a Fourth Amendment violation. The

educators were confronted with an almost impossible behavioral problem, which was only eventually ameliorated with medication. M.C.'s behavior was disruptive and dangerous. He repeatedly cursed at the teachers and students. App. 596. At times, he threatened the physical safety of the teachers, punching them and kicking them in the shins. App. 597; *see also* Dist. Ct. Op. at. 19. He also threatened the other children with statements such as: "I'm going to throw hot oil on you and kill you." The other first grade students in the class were undoubtedly frightened. App. 596. And the educators were faced with this challenge while simultaneously trying to control and teach the other students in the special education class. Temporarily removing M.C., given the threat he often posed to the emotional, psychological, and physical safety of the students and teachers, was eminently reasonable.

The educators' response was particularly reasonable given that the timeouts were expressly prescribed by M.C.'s IEP as a mechanism to teach him behavioral control. The IEP, which was developed by educational specialists in consultation with M.C.'s mother, and to which she agreed in writing, sets forth educational and behavioral methods that M.C.'s classroom teachers were required to follow. Neglecting to follow the IEP—including failure to use the prescribed timeouts—could have exposed the teachers to liability. *See ex rel. Van Duyn v. Baker School Dist. 5J*, 502 F.3d 811, 819 (9th Cir. 2007) (material failures to implement an IEP are violations of the IDEA); *Neosho R-V Sch. Dist. v. Clark*,

315 F.3d 1022, 1027 n.3 (8th Cir. 2003) (IDEA is violated when a school fails to implement an "essential" element of an IEP); *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000) (de minimis failures to implement an IEP do not violate the IDEA, but failures to implement "substantial" or "significant" IEP provisions do). While the timeouts were not as effective as the teachers hoped, their continued employment of timeouts over a two-month period was reasonable. If we do not allow teachers to rely on a plan specifically approved by the student's parents and which they are statutorily required to follow, we will put teachers in an impossible position—exposed to litigation no matter what they do.

While recognizing that M.C. was extraordinarily disruptive in class, the district court nonetheless denied qualified immunity because it found that several of the alleged seizures were unreasonable.[5] We therefore address the court's individual concerns.

### 1. Justified At Its Inception

First, the district court found that one of the seizures was not "justified at its inception" because M.C. was placed in the timeout room for "not following

---

[5] The district court did not find that all of the seizure incidents were unreasonable, only some, but it nonetheless denied defendants' motion for qualified immunity with respect to all of the seizures. We are unsure that this is the correct approach. If the district court were correct that some of the seizures were unreasonable, the plaintiff would still only be entitled to damages for those few problematic incidents. We need not address this problem, however, because we hold that the defendants are entitled to qualified immunity for all of the seizures.

directions to begin work on his phonics assignment." Dist. Ct. Op. at 19–20. The district court characterized this as "a question of fact whether defendants' placement of [M.C.] in the timeout room for failing to follow directions was justified at its inception." *Id.* at 20. We think this was a misunderstanding. While the nature of the underlying events—what happened—is a factual issue not reviewable by this Court, determining whether a timeout was "justified at its inception" is a question of law.

There is some factual dispute over the factual basis for the timeout: whether M.C.'s refusal to follow was the sole cause of the seizure that day. We resolve that dispute, as did the district court, in favor of the plaintiff. Nonetheless, the seizure was still justified at its inception. The Fourth Amendment does not hold that ensuring the safety of the class is the sole permissible reason for sending students to time out. M.C.'s own IEP suggests that timeouts may be useful as a technique to obtain cooperation and participation and to teach M.C. to "do what is asked of him." App. 466. If corporal punishment is a constitutionally acceptable form of discipline for a student's defiance, it is implausible that timeouts are not. *See Ingraham v. Wright*, 430 U.S. 651 (1977). When M.C. refused to do his school work, it was not unreasonable for the teachers to send him to a five-minute timeout in the hope of obtaining his cooperation in the future.

## *2. Related in Scope*

Second, the court also found, assuming arguendo that all the seizures were "justified at the inception," that the detentions were nonetheless not reasonably related in scope. A seizure is "permissible in its scope when the measures adopted are reasonably related to the objectives of the [seizure] and not excessive[] . . . in light of the age and sex of the student and the nature of the infraction." *New Jersey v. T.L.O.*, 469 U.S. 325, 342 (1985).

Comparing the situation to *Edwards v. Rees*, 883 F.2d 882 (10th Cir. 1989), a case in which the vice principal detained a student for twenty minutes of questioning after the student was accused of making a bomb threat, the district court stated:

> [I]n contrast, Defendant Brady and her assistants detained [M.C.], a six-year-old child with emotional disabilities, for lengthy periods of time (up to one hour and forty-two minutes, based upon APS's own records, and approximately six hours, according to Plaintiff), in a 'closet,' for offenses that were, relatively speaking, significantly less serious than a bomb threat. Indeed, on certain occasions, Brady and her assistants placed M.C. in the timeout room for not following directions, giving angry looks, mimicking his peers, and continuously talking; Brady's assistants extended M.C.'s detention even after M.C. complied with the five-minute rule, for remaining silent after expiration of the five minute rule and refusing to answer a question on one occasion and for trying to force a door open at the expiration of five minutes of silence on another occasion.

App. 20–21. Because "[t]he nature of these offenses by a six-year-old, first-grade student are not similar in kind to an offense committed by a middle school student

involving a bomb threat to a school," the court held the scope of the timeouts was not reasonably related to the necessity of the seizure in the first place. *Id.*

We do not agree with this mode of analysis. Although a bomb threat is more serious misconduct than M.C.'s threats, taunts, and tantrums, the comparison does not make the defendants' use of timeouts unreasonable. The detentions in the two cases had entirely different purposes. In *Edwards*, the student was detained for the purpose of questioning, and twenty minutes was all that was required. In this case, timeouts were employed as a technique for behavioral modification, and the length of time was determined accordingly.

The district court was troubled both by the length of the timeouts and by their continued use even when M.C.'s conduct seemed to deteriorate, rather than improve, while locked in the room. The district court found that M.C.'s detentions lasted "up to one hour and forty-two minutes, based upon APS's records (or six hours, based upon Plaintiff's testimony), for conduct as minor as not following direction, even though placement in the timeout room arguably exacerbated [M.C.'s] problematic behavior and his emotional state." Dist. Ct. Op. at 22.[6] M.C. did spend a considerable period locked in the timeout room, and perhaps in retrospect this was not an effective disciplinary technique. But as the district court found, even when M.C. entered the room for a small infraction,

_____

[6] It is our understanding that the detention calculation is a daily aggregate, and not the total for any individual incident. *See* Dist. Ct. Op. at 24.

M.C. would "throw[ ] his body against the walls and door of the timeout room" such that the teachers would have to "put all [of their] weight against the door" to keep it shut. Dist. Ct. Op. at 22. Given conduct like this, it was not unreasonable for the teachers to continue to detain M.C., particularly considering that they had a reasonable fear of violence given his past behavior.

The district court found unreasonable what it described as the educators' decision to "barricade [M.C.] in a closet-like timeout room for one hour and thirty-five minutes" for his "original offense of refusing to do his spelling test, throwing his pencil into the back of his desk, and starting to walk forcefully toward the rest of the class . . . ." Dist. Ct. Op. at 24. But this is an incomplete picture of what occurred. The educators did not confine him to the timeout room for these lengthy periods in response to his initial misconduct. The general rule was that he would be confined until he had maintained calm behavior for five minutes. It is undisputed that the further detention was in response to M.C.'s continued misbehavior on the way to the timeout room, or while in it. As the plaintiff acknowledges, on the way to the timeout room after refusing to do his spelling test, M.C. began to kick and spit at the door and scream and curse at the teachers. *See* Appellee's Br. 9–10. Thus, the reasonableness of the "scope" of the seizure expanded given M.C.'s conduct.

The district court also found it unreasonable to "detain[]" M.C. in a timeout room for twenty-five minutes, "despite the fact that [he] was becoming

increasingly distraught." Dist. Ct. Op. at 24. Whether or not it was wise educational policy to keep M.C. in the timeout room when his behavior was not improving may be a difficult question. Perhaps the timeout room exacerbated M.C.'s misbehavior. But whether the timeouts were a good or effective teaching method is not the relevant question: the question is only whether the seizure was "unreasonable under the circumstances then existing and apparent." *Wallace*, 68 F.3d at 1014. The behavioral component of M.C.'s IEP was based on the imposition of "clear rules with consistent implementation of consequences," App. 466, including supervised time out, and the teachers may have believed that letting him out of timeout before he had settled down for five minutes would undermine the program. This was primarily a pedagogical judgment for the educators on the spot to make. There is no allegation that the defendants acted maliciously, but only that they misjudged the circumstances. Pedagogical misjudgments (even assuming these were misjudgments, which we cannot say), do not, without more, expose teachers to liability under the Fourth Amendment.

Supreme Court opinions reinforce our disinclination to insert ourselves into the evaluation of educational policy and techniques. "[T]he education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988). "[C]ourts should be loathe to intrude very far into interstitial details or to become embroiled in captious disputes as to the

precise efficacy of different instructional programs." *Roland M. v. Concord School Comm.*, 910 F.2d 983, 992 (1st Cir. 1990). Indeed, it is safe to assume that specially-trained and experienced teachers will know far more than we do about techniques best designed to improve a child's behavior. Here, Ms. Brady had several years of special education experience, during which she served as the educational director for day treatment at a children's center, and as a behavior manager for another student. She was also licensed by the Public Education Department as a special education teacher. Just as we often defer to the expertise of police officers when they determine that there is reasonable suspicion of criminal conduct, *see United States v. Hauk*, 412 F.3d 1179, 1187–88 (10th Cir. 2005), so do we defer to a teacher's expertise about how to manage disciplinary problems or inculcate appropriate behavioral skills in his or her class. *See Wofford v. Evans*, 390 F.3d 318, 323 (4th Cir. 2004) (Wilkinson, J.) ("[L]eeway is particularly necessary when school discipline is involved. . . . The Supreme Court has long recognized that educators are best situated to identify those needs and optimize their implementation."); *see also Wallace*, 68 F.3d at 1014 (We do not narrow the "acceptable range of action for dealing with disruptive students."). Unless the teacher's chosen method is patently unreasonable or blatantly not tailored to meeting the child's needs, we respect the teacher's choice. *See Wallace*, 68 F.3d at 1014 ("Depending on the circumstances, reasonable action

may certainly include the seizure of a student in the face of provocative or disruptive behavior.").

Additionally, while with the benefit of hindsight we know that the timeouts may have been ineffective, the period in which the educators implemented this strategy lasted only from October 28, 2002, until January 9, 2003—just over two months. It was not unreasonable to believe that the technique might become effective over time if consistently implemented. Two months of mixed results is not such a long period that a reasonable teacher would necessarily have abandoned this option, particularly given that the technique was mandated by the IEP.

The district court also found that the timeouts were "unreasonable" because they occurred in a "'closet'-like timeout room, with nothing in it, no exterior window, dim light, and black construction paper over the window." Dist. Ct. Op. at 23. The district court noted that the New Mexico Department of Education and the Arizona Public School have issued standards directing that "timeout rooms must remain unlocked and free and clear of obstructions," and be "clean, well lit, ventilated and free of all objects." App. 627, 639.

While we accept the district court's finding that the timeout room did not precisely meet these standards, the Supreme Court has made clear that officials "do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision." *Davis v. Scherer*, 468 U.S. 183, 194

-23-

(1984); *see also Tanberg v. Sholtis*, 401 F.3d 1151, 1159-60 (10th Cir. 2005); *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992) ("The issue is whether [the officer] violated the Constitution, not whether he should be disciplined by the local police force."). The Constitution establishes certain minimum thresholds for official conduct. It is to be expected—and hoped—that states, school boards, police departments, and other agencies will go beyond constitutional minima in determining the standards and policies to which their employees must conform. If federal courts were to regard such standards as setting the boundaries for reasonableness under the Fourth Amendment and thus for purposes of imposing monetary liability on local officials and agencies, it would create a disincentive for the promulgation of rigorous standards, and would place interpretation and enforcement of those standards into the hands of federal judges. *See Davis*, 468 U.S. at 195; *Herring v. Kennan*, 218 F.3d 1171, 1180 (10th Cir. 2000).

Aside from any deviation from state or local standards, and accepting the district court's judgment that the conditions in the timeout room were less than ideal, we do not believe that they were "unreasonable" under the Fourth Amendment. The room may have been small, but it was unlocked and ordinarily well lit. The teachers' decision to "forcibly restrain[] the door," Dist. Ct. Op. at 23, was a reasonable response to a child who was scratching and kicking at the door while shouting curse words and death threats. Likewise, the black

-24-

construction paper was placed on the window to prevent M.C. from looking out of the room and making faces at the other students in the class.

Finally, the district court was troubled by the plaintiff's assertion that the teachers kept M.C. in the timeout room "despite the fact that [M.C.] repeatedly begged Brady to release him from the room to go to the bathroom." Dist. Ct. Op. at 22. The court found that M.C. "did . . . urinate on himself while in the timeout room," and that he "threw up and/or appeared to throw up in the timeout room." *Id*. at 22–23. We agree that these facts, if true, are disturbing. But the teachers were unfortunately faced with a "boy who cried wolf" situation. M.C. consistently tried to escape from the room rather than calm down and follow directions, offering a plethora of excuses. The teachers' beliefs that his request to go to the bathroom, delivered among screams and threats, was a similar attempt at release, was not unreasonable.

In retrospect, the teachers may not have used the most effective technique for teaching M.C. good behavior. The district court stated that "it appears that on most occasions [M.C.] had greater control of himself prior to being placed in the timeout room than after being placed in the timeout room." Dist. Ct. Op. at 23. But whether the teachers picked the best strategy is not the question before us. The question is whether the teachers' conduct was constitutionally unreasonable. M.C.'s emotional problems posed an extremely difficult challenge. We refuse to say that given this situation, these diligent and well-trained teachers acted

unreasonably in continuing to use timeouts, as prescribed by M.C.'s IEP. Teachers have a challenging job as is. We need not make it harder by imposing personal liability when their attempts do not succeed. We therefore find that there was no Fourth Amendment violation here, and that the three individual defendants are entitled to qualified immunity on this claim.

## IV. Procedural Due Process

The Fourteenth Amendment forbids the State from depriving an individual of life, liberty, or property without due process of law. "[T]he range of interests protected by the procedural due process clause is not infinite," however; *Board of Regents v. Roth*, 408 U.S. 564, 570 (1972); rather, "[a] person alleging that he 'has been deprived of his right to procedural due process' must prove two elements: that he possessed a constitutionally protected liberty or property 'interest such that the due process protections were applicable,' and that he was not 'afforded an appropriate level of process.'" *Zwygart v. Board of County Comm'rs of Jefferson County, Kan.*, 483 F.3d 1086, 1093 (10th Cir. 2007) (quoting *Farthing v. City of Shawnee, Kan.*, 39 F.3d 1131, 1135 (10th Cir. 1994)). Ms. Couture claims that the defendants violated M.C.'s Fourteenth Amendment procedural due process rights by excluding him from the classroom without a hearing. The district court denied summary judgment on the defendants' motion for qualified immunity after calculating that the teachers removed M.C. from the classroom approximately twenty-one times for a total of twelve hours, finding this

a "more than trivial" deprivation of the education to which he was legally entitled. Dist. Ct. Op. at 30.

In *Goss v. Lopez*, 419 U.S. 565, 574 (1975), the Supreme Court declared that public school students have a protected property interest in public education and a liberty interest in their reputations, and therefore are entitled to certain procedural due process protections within the educational context. The Court did not, however, delineate the precise contours of those protections: rather, it dealt only with the specific factual scenario of a ten day suspension constituting "total exclusion from the educational process." *Id*. at 576. When complete deprivation of education occurs, such as when a student is removed from the school for a lengthy time period, the Court ruled that the student at minimum is entitled to "notice and . . . some kind of hearing," though the "timing and content of the notice and the nature of the hearing will depend on the appropriate accommodation of competing interests involved." *Id*. at 578–79.

The district court found that the timeouts were designed both to punish M.C., and to educate him. Under either rationale, there has been no constitutional violation. Timeouts, unlike suspensions or expulsions, are intended to settle down a child while keeping him within close proximity to the classroom; this way, he can resume his education as soon as he has calmed. This method balances the need for punishment and discipline with the important goal of preserving access to public education. While the child is temporarily removed

-27-

from the classroom, any loss of a property right is de minimis and not subject to procedural protections. *See, e.g.*, *Hassan v. Lubbock Independent School Dist.*, 55 F.3d 1075, 1080–81 (5th Cir. 1995) ("*De minimis* or trivial deprivations of liberty in the course of the disciplining of a student do not implicate procedural due process requirements."); *Dickens v. Johnson County Bd. of Educ.*, 661 F. Supp. 155 (E.D. Tenn. 1987) (segregation of child to "timeout" box without notice or hearing did not implicate procedural due process protections); *Fenton v. Stear*, 423 F. Supp. 767 (W.D. Pa. 1976) (assignment to a room and a prohibition of participation in school trip were a de minimis interference with rights).

At some point, punishment timeouts used excessively might become the functional equivalent of the out-of-school suspension at issue in *Goss*. But this was not the case here. The district court found that "over the course of approximately two and one-half months, Defendants placed [M.C.] in the timeout room 21 times for a total of approximately twelve hours . . . [I]n total, these placements . . . constituted an exclusion from the education process that was more than trivial." Dist. Ct. Op. at 30. We do not agree with the district court's legal conclusion that this was a "more than trivial . . . exclusion" similar to that in *Goss*. Missing twelve hours of class over two and a half months is incomparable to missing ten straight days of instruction. We have found no cases that require procedural protections prior to the implementation of similar punishments, and decline to require them here. *See Laney v. Farley*, 501 F.3d 577, 581–82 (6th Cir.

2007) (a one-day in-school suspension did not infringe on the plaintiff's property or liberty interest); *Hassan*, 55 F.3d at 1078–80 (locking student in a holding room when he misbehaved did not require any procedural protections).

Moreover, the assumption that the timeouts were a deprivation of M.C.'s right of education under these circumstances is questionable. At M.C.'s age and given his severe emotional and behavioral difficulties, teaching him self-control was among the most important components of his educational program. As shown by the prescription of timeouts in his IEP, these sessions were not an interruption of his education; they were part of his education. Even assuming that the timeouts were ineffective, or even counterproductive, they cannot be treated as equivalent to denying him the education to which he is legally entitled.

Further, a teacher's ability to manage his or her classroom would be inappropriately undermined by a hearing requirement prior to placing the student in timeout. To determine what process is due, courts must balance: (1) the private interests that will be affected by the official action; (2) the risk of erroneous deprivation; and (3) the burden on the government from additional procedural requirements. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). The additional value of a hearing before, or even after, timeout, is minimal, as timeouts are imposed "in response to conduct directly observed by teachers in their presence;" "the risk that a child [would] be [sent to timeout] without cause is typically insignificant." *Ingraham v. Wright*, 430 U.S. 651, 677–78 (1977). On the other

-29-

side of the coin, timeouts may be an effective way to maintain order given an immediate discipline problem. We are reluctant to limit a teacher's ability to manage her classroom by requiring her to give the student a "hearing" of some form. This is an undue administrative burden we will not impose unless the timeouts rise to the level of the functional equivalent of a lengthy in-school suspension.

## V. CONCLUSION

We **REVERSE** the district court's denial of qualified immunity on Ms. Couture's Fourth and Fourteenth Amendment Procedural Due Process Claims against the individual educators, and **REMAND** to the district court for further proceedings in accordance with this opinion.