RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0349p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

CHARITY HALASZ and THOMAS HALASZ, on behalf of
their child, H.H., a minor,

*Plaintiffs-Appellants,*

*v.*

No. 25-1492

CASS CITY PUBLIC SCHOOLS, in its official capacity;
WILLIAM HARTZELL, ALLISON ZIMBA, DONALD
MARKEL, and STACEY BLISS, in their official and
individual capacities,

*Defendants-Appellees.*

─────────────

Appeal from the United States District Court for the Eastern District of Michigan at Bay City.
No. 1:22-cv-13158—Thomas L. Ludington, District Judge.

Decided and Filed:  December 18, 2025

Before:  SILER, KETHLEDGE, and MATHIS, Circuit Judges.

─────────────

## COUNSEL

─────────────

**ON BRIEF:**  Keith Altman, THE LAW OFFICE OF KEITH A. ALTMAN, Farmington Hills,
Michigan, for Appellants.  Kailen C. Piper, O'NEILL, WALLACE & DOYLE P.C., Saginaw,
Michigan, for Appellees.

─────────────

## OPINION

─────────────

MATHIS, Circuit Judge.  About a week after a student opened fire at a high school in
Oakland County, Michigan, eighth-grade student H.H. allegedly made comments during class at
another Michigan school about either having a gun or bringing a gun to school.  School and law-
enforcement officials questioned H.H. about his comments in the school's office and searched

H.H., his backpack, and his locker.  They found nothing.  But the school district expelled him for making a threat of violence.

H.H.'s parents, Charity Halasz and Thomas Halasz, sued the school district and several of its officials under 42 U.S.C. § 1983.  They contend that school officials unlawfully seized H.H. when they questioned him and unlawfully searched him for a firearm.  They also contend that the expulsion hearing violated H.H.'s due-process rights.  And they bring tort claims against the defendants.  Because the Halaszes cannot show that the defendants violated his constitutional rights and because the defendants are immune from liability for the tort claims, we affirm the district court's grant of summary judgment to the defendants.

**I.**

During the 2021–22 school year, Charity and Thomas Halasz's child, H.H., was an eighth grader at Cass City Public Schools.  But that fall, a tragic incident occurred at another Michigan high school 60 miles away.  There, Ethan Crumbley opened fire, killing four students and severely injuring seven others, in what would become the deadliest high-school shooting in Michigan history.

In the aftermath, schools in Michigan grappled with how to approach safety concerns on campus, setting the stage for this action.  On the morning of December 6, 2021, Principal William Hartzell of Cass City Jr./Sr. High School gave a video presentation to his students advising them about school safety.  But later that day, a similar gun-related threat purportedly happened on campus.

During the students' third-hour classes, H.H. and several other eighth graders were in science class.  Although H.H. denies that anything noteworthy happened during this class period, other students said differently.  One student claimed that H.H. "said that he had guns and that if he brought them to the school, nobody would do anything about it."  R. 17-10, PageID 654. Another student "heard H.H. say something about him bringing a fake but metal gun to school." R. 17-11, PageID 680.  A third student claimed that they "heard him say something about having a gun in his bag."  R. 18-2, PageID 745.  And a fourth student, R.B., testified that she heard H.H. state that "he was thinking about bringing a gun to school."  R. 18-1, PageID 711.

This concerned R.B. because, according to her, H.H. had commented in the past about having access to guns.

R.B. then texted her mother, Stacey Bliss, that H.H.'s alleged comments made her feel unsafe. And both R.B. and another student reported the remarks to school staff. Bliss, a board member of the school district, called Allison Zimba, the school district's superintendent, and requested an investigation. Superintendent Zimba then approached Principal Hartzell, who had received a phone call from another parent reporting the same concern. The two then raised this incident with the school district's behavioral officer, Donald Markel, who in turn requested assistance from Lieutenant Brian McComb, a Michigan state police officer.

Shortly thereafter, Superintendent Zimba, Lt. McComb, and Officer Markel interviewed H.H. while he was in the office waiting on his grandmother to pick him up from school. No one advised H.H. of his *Miranda* rights or informed him that Lt. McComb was also conducting a criminal investigation. During the interview, H.H. denied making any threats or comments about possessing a gun on campus. But after around ten minutes of questioning, he agreed to remove his sweatshirt and shoes for a search. H.H. claims that he was also instructed to raise his shirt and pull around the waistband of his pants. Superintendent Zimba then searched his backpack, and Officer Markel searched his locker. They did not locate a firearm.

The school district and the Michigan State Police continued to investigate. In the afternoon before school let out, Lt. McComb, Superintendent Zimba, and Officer Markel interviewed several students who overheard H.H.'s alleged remarks. And later that evening, the state police searched the Halaszes' house, locating a gun safe but no firearms. From this, the state police concluded that H.H. "may have been misunderstood" and did not pose any immediate danger to students or staff. R. 36-2, PageID 1556. The state police shared this conclusion with Superintendent Zimba, but cautioned her that they "did not feel comfortable with him remaining in school." R. 18-5, PageID 895. Around the same time, the school's administration team determined that, at the very least, H.H. violated the school district's code of conduct by making threatening remarks.

As a result of the violation, the administration issued H.H. eight disciplinary points for "gross misbehavior," which triggered a referral for an expulsion hearing before the district's school board ("Board"). R. 17-3, PageID 230. Student discipline at Cass City Public Schools is governed by a point system, which assigns default point values to certain categories of misconduct that increase based on severity. When a student accrues fifteen points, he can be referred to the Board for an expulsion hearing. In H.H.'s case, he had already accumulated seven disciplinary points before the new violation, so the addition of eight extra points triggered his referral to the Board for an expulsion hearing.

The school administration formally referred H.H.'s case to the Board on December 7, 2021—the day after the incident—with the recommendation that the Board expel him for 180 days. That same day, Superintendent Zimba sent H.H.'s family a letter outlining this decision and H.H.'s respective rights. The letter also notified his family that his expulsion hearing was scheduled for December 13.

At his expulsion hearing, H.H. was represented by counsel and appeared alongside his parents. As a board member, Bliss was present at the hearing but abstained from voting. The Board was tasked with deciding whether H.H. violated the school district's policy and whether expulsion was warranted based on a multi-factor balancing test. These "Mandatory 7 Factors" included: (1) the student's age, (2) the student's disciplinary history, (3) the student's disability status, (4) the seriousness of the student's behavior or misconduct, (5) whether the student's behavior or misconduct posed a safety risk, (6) whether restorative practices were a better option, and (7) whether any lesser intervention would be more appropriate. Although student safety was a major consideration during the proceeding, Superintendent Zimba failed to disclose to the Board the state police's determination that H.H. did not pose an immediate danger. The parties dispute the impact of this nondisclosure because the Board ultimately expelled H.H. for 180 days.

The Halaszes then sued the school district, Bliss, Superintendent Zimba, Principal Hartzell, and Officer Markel, asserting Fourth Amendment and due-process claims under 42 U.S.C. § 1983, and negligence and intentional-infliction-of-emotional-distress claims under Michigan law. The district court granted the defendants summary judgment on all claims. This appeal timely followed.

## II.

We review the grant of summary judgment de novo. *Puskas v. Delaware County*, 56 F.4th 1088, 1093 (6th Cir. 2023). Summary judgment is appropriate where "the movant shows that there is no genuine dispute [of] material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of establishing that there is no genuine dispute of material fact. *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 566 (6th Cir. 2023). We view all evidence and draw all reasonable inferences in a light most favorable to the nonmoving party. *Palma v. Johns*, 27 F.4th 419, 427 (6th Cir. 2022).

## III.

We turn first to the Halaszes' federal constitutional claims. "To succeed on a § 1983 claim, a plaintiff must first identify a constitutional right, then show that a person acting under the color of state law deprived him of that right." *Susselman v. Washtenaw Cnty. Sheriff's Off.*, 109 F.4th 864, 870 (6th Cir. 2024). The Halaszes challenge the grant of summary judgment to the defendants on their: (1) unconstitutional-search claim, (2) unconstitutional-seizure claim, (3) procedural-due-process claim, and (4) substantive-due-process claim. We address each claim in turn.

### A. Unconstitutional Search

Applicable to the States through the Fourteenth Amendment, the Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches." U.S. Const. amend. IV; *Maryland v. Pringle*, 540 U.S. 366, 369 (2003). Children, like adults, have constitutional rights. And they "do not shed their constitutional rights at the schoolhouse gate." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646,

655–56 (1995) (citation modified). "The nature of those rights is what is appropriate for children in school." *Id.* at 656. To that end, students have a right to be free from unreasonable searches by public-school officials. *New Jersey v. T.L.O.*, 469 U.S. 325, 333 (1985).

Students' Fourth Amendment rights "are different in public schools than elsewhere." *Id.* To determine whether a search of a student is unreasonable in the public-school context, we must engage in a "twofold inquiry." *T.L.O.*, 469 U.S. at 341. First, we must determine whether the search was "justified at its inception." *Id.* (quotation omitted). Such justification exists when a school official believes that there is a "moderate chance of finding evidence of wrongdoing." *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 371 (2009). This is akin to a reasonable-suspicion standard. *Id.* at 370. Second, if we conclude that the search was justified, we must then decide whether "the search as actually conducted was reasonably related in scope to the circumstances which justified the interference in the first place." *T.L.O.*, 469 U.S. at 341 (citation modified). The scope of a search will be permissible when "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 342.

The Halaszes do not argue that the school officials' searches of H.H., his backpack, and his locker were unjustified. They argue only that the officials exceeded the scope of what the circumstances warranted. We disagree.

We measure the reasonableness of a search's scope by its intrusiveness considering the prevailing circumstances and objectives. *See Redding*, 557 U.S. at 375–76. So what were the circumstances and objectives here? Students and parents notified the school administration of a purported threat made by H.H. This purported threat involved the carrying of a firearm onto school property. And a school shooting had taken place one week earlier just 60 miles away. As a result, the school officials' objective in conducting the search was to ascertain whether H.H. possessed a gun. Given this backdrop, a light search of H.H.'s body—requiring him to remove his shoes and sweatshirt, raise his t-shirt, and pull the waistband of his pants—and searches of his backpack and locker were "reasonably related" to the circumstances. *T.L.O.*, 469 U.S. at 341. After all, the places searched could all house a weapon.

And despite the potential danger of the situation, the school officials tried their best to maintain H.H.'s physical privacy throughout the search of his body and belongings. For example, at no point did officials touch H.H., nor did they conduct a more invasive search. *Cf. Redding*, 557 U.S. at 368 (holding that school officials conducted an unconstitutional search when they strip searched a thirteen-year-old female student despite reasonable suspicion that the student brought controlled substances to school). The scope of H.H.'s search was therefore reasonable under the Fourth Amendment.

The Halaszes' counterarguments do not alter this conclusion. First, the Halaszes contend that the scope of the search was unreasonable because H.H. was not advised of his rights, in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and district policy. But whether the administration failed to advise H.H. of these rights does not bear upon the actual intrusiveness of the search conducted, which was reasonable given the circumstances and "nature of the infraction." *T.L.O.*, 469 U.S. at 342. Second, the Halaszes argue that the scope of H.H.'s search was unreasonable because the defendants failed to notify them before law enforcement searched H.H. True, the school district's policy requires school officials to make a reasonable attempt to contact a student's parents before a law-enforcement officer can question him or her. But whether school officials violated this policy has no bearing on the constitutionality of the searches.

In sum, the facts, viewed in the light most favorable to the Halaszes, show that the school officials' search of H.H. was reasonable under the Fourth Amendment.

**B. Unconstitutional Seizure**

The Fourth Amendment also guarantees the right of the people to be free from unreasonable seizures. U.S. Const. amend. IV. Generally speaking, "a person has been seized within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *California v. Hodari D.*, 499 U.S. 621, 627–28 (1991) (citation modified). This general rule does not apply to students in public schools, where compulsory school attendance can limit a student's "right to come and go at will." *Vernonia*, 515 U.S. at 654. But just as school officials

are barred from conducting unreasonable searches, so too are they prohibited from conducting unreasonable seizures of students. We indicated recently that we have "never decided in a published opinion whether or how the Fourth Amendment's guarantee against unreasonable seizures applies in the public-school context." *Johnson ex rel. X.M. v. Mount Pleasant Pub. Schs.*, 155 F.4th 759, 768 (6th Cir. 2025). So we take the opportunity to do so.

We hold that a public-school official makes a Fourth Amendment seizure of a student when the official limits "the student's freedom of movement" in a manner that "significantly exceed[s] that inherent in everyday, compulsory attendance." *Couture v. Bd. of Educ. of Albuquerque Pub. Schs.*, 535 F.3d 1243, 1251 (10th Cir. 2008). "Restricting the liberty of students is a *sine qua non* of the educational process." *Wallace ex rel. Wallace v. Batavia Sch. Dist. 101*, 68 F.3d 1010, 1013–14 (7th Cir. 1995). For instance, "students are generally not at liberty to leave the school building when they wish." *Couture*, 535 F.3d at 1250–51. Thus, requiring a limitation on movement beyond the typical restriction on students' ability to move about, and outside of, school as they see fit before classifying such a restriction as a "seizure" accounts for "schools' custodial and tutelary responsibility for children." *Vernonia*, 515 U.S. at 656.

We still must determine when a seizure of a student becomes unreasonable. To that end, we adopt the *T.L.O.* reasonable-suspicion standard for Fourth Amendment searches in the public-school context and apply it to Fourth Amendment seizures in the same context. Thus, the seizure of a student is reasonable if it is: (1) justified at its inception, i.e. "there is a reasonable basis for believing that the pupil has violated the law or a school rule," and (2) "reasonably related in scope to the circumstances which justified it in the first place." *S.E. ex rel. A.E. v. Grant Cnty. Bd. of Educ.*, 544 F.3d 633, 641 (6th Cir. 2008) (citation modified). We join several of our sister circuits that have adopted the *T.L.O.* standard for analyzing unreasonable-seizure claims made by students in the public-school context. *See Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1304 (11th Cir. 2006); *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 148 (3d Cir. 2005); *Wofford v. Evans*, 390 F.3d 318, 326 (4th Cir. 2004); *Doe ex rel. Doe v. Haw. Dep't of Educ.*, 334 F.3d 906, 909 (9th Cir. 2003); *Wallace*, 68 F.3d at 1013–14; *Hassan ex rel. Hassan v.*

*Lubbock Indep. Sch. Dist.*, 55 F.3d 1075, 1079 (5th Cir. 1995); *Edwards ex rel. Edwards v. Rees*, 883 F.2d 882, 884 (10th Cir. 1989).

The Halaszes argue that school officials unreasonably seized H.H. They claim that H.H. was seized when officials brought him to the principal's office after being told that H.H. may be in possession of a firearm. And they claim the seizure was unreasonable because no one informed H.H. of his *Miranda* rights or told him that he was under a criminal investigation. Yet even assuming that school officials seized H.H., we cannot conclude that such a seizure was unreasonable. The school officials had clear justification to hold H.H. to question him about his purported comments in class. And they held him only for 30 minutes—which was "no longer than necessary to" investigate and "confirm that [he] had no gun on [his] person or in" his belongings. *Wofford*, 390 F.3d at 327. That H.H. was not advised of a criminal investigation or read his rights does not alter this conclusion.

### C.  Procedural Due Process

The Fourteenth Amendment's Due Process Clause prohibits the States from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV., § 1. To succeed on a procedural-due-process claim, a plaintiff must show: "(i) deprivation by state action of a protected interest in life, liberty, or property, and (ii) inadequate state process." *Reed v. Goertz*, 598 U.S. 230, 236 (2023). Adequate state process generally requires "notice and opportunity for hearing appropriate to the nature of the case" before the government deprives a person of life, liberty, or property. *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950).

Public-school students facing expulsion or suspension are entitled to due-process protection. *Goss v. Lopez*, 419 U.S. 565, 581 (1975); *Newsome v. Batavia Loc. Sch. Dist.*, 842 F.2d 920, 927 (6th Cir. 1988). "The minimum requirements established for school expulsions . . . are oral and written notice of the charges against the student and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Newsome*, 842 F.2d at 927 (citation modified). A concern for fairness pervades as "students have interests under the Due Process Clause qualifying them for protection 'against

unfair or mistaken findings of misconduct and arbitrary exclusion from school.'" *Heyne v. Metro. Nash. Pub. Schs.*, 655 F.3d 556, 566–67 (6th Cir. 2011) (quoting *Goss*, 419 U.S. at 581).

School officials provided H.H. with adequate process. They provided him notice of the charges against him and the opportunity for a hearing before the Board. At the expulsion hearing, H.H. was represented by counsel who addressed the Board on his behalf. And they explained to him witness descriptions of his purported comments at the hearing. This met the minimum procedural-due-process requirements. *See Newsome*, 842 F.2d 927.

The Halaszes argue primarily that Superintendent Zimba violated H.H.'s right to due process by withholding from the Board the state police's opinion that H.H. posed no immediate danger. This argument, however, has one major flaw—the Board expelled H.H. because it found that he *said* he had a gun, not because he *possessed* one. At the end of its investigation, the state police concluded that H.H. did not possess a firearm and thus was not an "immediate danger" to others. But whether he posed a real physical danger to his fellow students is independent of whether he made a comment that sounded like a threat. There is no question that such a comment in this context could substantiate a safety risk. And ultimately, this was the basis for H.H.'s expulsion. Therefore, the Board's decision to expel H.H. was not based on a clearly mistaken finding of misconduct and did not violate H.H.'s due-process rights. *See Goss*, 419 U.S. at 581.

That the superintendent may have withheld the state police's conclusion that witnesses possibly misunderstood H.H. does not change our analysis. After conducting its investigation, the state police determined that H.H. may have been misunderstood due to competing recollections of what he might have said in class. But the Board independently reviewed the same student testimony and concluded on its own that H.H. said that he had a gun. That the Board and the state police may have reached different conclusions does not mean that H.H. suffered a procedural-due-process violation.

The Halaszes also contend that the Board was biased against H.H. "To insure fundamentally fair procedures, school officials responsible for deciding whether to exclude a student from school must be impartial." *Heyne*, 655 F.3d at 567 (citation modified). "[A] biased

decisionmaker [is] constitutionally unacceptable." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). That said, "school-disciplinary committees are entitled to a presumption of impartiality, absent a showing of actual bias." *Doe v. Miami Univ.*, 882 F.3d 579, 601 (6th Cir. 2018) (quotation omitted).

No evidence in the record shows that the Board was actually biased against H.H. That means a presumption of impartiality applies to the Board, which the Halaszes must rebut. *See id.*

The Halaszes argue that the Board was biased against H.H. because Board members reviewed H.H.'s disciplinary record "prior to any determination of wrongdoing." D. 21 at p.30 (emphasis omitted). But the Halaszes provide no jurisprudential support showing that an awareness of a student's disciplinary history constitutes actual bias, much less that it can rebut the presumption of impartiality.

Next, the Halaszes contend that Board member Bliss, who reported the allegation about H.H. to Superintendent Zimba, was biased against H.H. True, Bliss was present at his expulsion hearing. But she recused herself from voting and did not deliberate in the proceeding. In any event, the Halaszes would have needed to present more concrete evidence of bias even if Bliss had failed to recuse herself as "due process is not necessarily violated when the school official who initiates, investigates, or prosecutes charges against a student plays a role in the decision to [penalize] the student." *Miami Univ.*, 882 F.3d at 601 (citation modified). Simply put, the Halaszes have not provided sufficient evidence to show that any bias impacted H.H.'s expulsion hearing.

### D. Substantive Due Process

The Halaszes' substantive-due-process claim fares no better. Substantive due process "bar[s] certain government actions regardless of the fairness of the procedure used to implement them." *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (quotation omitted). To succeed on this claim, a plaintiff must show (1) they were deprived of a constitutionally protected interest, and (2) "the government's discretionary conduct that deprived that interest was constitutionally repugnant." *Guertin v. Michigan*, 912 F.3d 907, 922 (6th Cir. 2019). The parties agree that H.H. has a right to education under Michigan law and that his expulsion

deprived him of this right.  Thus, the main issue before us is whether the decision to expel H.H. was "constitutionally repugnant." *Id.*

"There are various contexts in which courts have found that substantive due process is violated—including that the action was 'willful and unreasoning,' 'shocks the conscience,' was 'extremely irrational,' or lacks 'some factual basis.'" *Johnson v. City of Saginaw*, 980 F.3d 497, 513 (6th Cir. 2020) (citation modified).  "Substantive due process also protects the right not to be subject to 'arbitrary or capricious' action by a state either by legislative or administrative action." *Id.* (citation modified).  In the context of school discipline, "a substantive due process claim will succeed only in the rare case when there is no rational relationship between the punishment and the offense." *Seal v. Morgan*, 229 F.3d 567, 575 (6th Cir. 2000) (citation modified).

The Halaszes argue that H.H.'s expulsion both shocks the conscious and is unconstitutionally arbitrary.

To start, H.H.'s expulsion does not shock the conscience.  Government conduct shocks the conscience when it (1) infringes on the "decencies of civilized conduct," (2) is "so brutal and so offensive to human dignity," or (3) interferes "with rights implicit in the concept of ordered liberty." *Guertin*, 912 F.3d at 923 (citation modified).  Yet even if it is true that H.H. never had a weapon nor posed an immediate danger to other students, the Board's decision to expel him does not fit within any of these three categories.  Moreover, the Halaszes have not explained how the expulsion fits within "the sort of egregious behavior" that substantive due process prohibits, and we are loath to "transform[] run-of-the-mill tort claims into violations of constitutional guarantees." *Id.* (quotation omitted).

Nor was the decision to expel H.H. unconstitutionally arbitrary.  An action is arbitrary if it lacks any rational basis. *See Am. Express Travel Related Servs. Co. v. Kentucky*, 641 F.3d 685, 689 (6th Cir. 2011).  Here, the offense was H.H. making a remark about having a firearm at school, and the punishment was a 180-day expulsion.  There was a rational relationship between the two, especially given the heightened sensitivity to such comments at the time.  That H.H. did not possess a firearm, bring one to school, or immediately endanger another student does not

alter our conclusion either, even when viewing the evidence in the light most favorable to the Halaszes.

### E.  Qualified Immunity

The individual defendants are entitled to qualified immunity.  Qualified immunity shields government officials sued in their personal capacity from liability for civil damages unless: "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time."  *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (citation modified).

The Halaszes bear the burden of showing that the individual defendants are not entitled to qualified immunity.  *Mosier v. Evans*, 90 F.4th 541, 546 (6th Cir. 2024).  Because they failed to establish that any defendant violated H.H.'s constitutional rights, they failed to meet this burden.[1]

### IV.

We turn now to the Halaszes' state-law claims.  They assert claims of negligence and intentional infliction of emotional distress, under Michigan law, against the school district and the individual defendants.  The defendants argue that they are immune from liability under Michigan's Governmental Tort Liability Act.  We agree.

### A.  Claims Against the School District

We consider first the Halaszes' tort claims against the school district.  With limited exceptions not applicable here, Michigan law grants "immun[ity] from tort liability" to any "governmental agency . . . engaged in the exercise or discharge of a governmental function." Mich. Comp. Laws § 691.1407(1).  A governmental function is an "activity that is . . . mandated or authorized by constitution, statute, local charter or ordinance, or other law."  *Id.* § 691.1401(b).  A school district is a governmental agency.  *Id.* § 691.1401(a), (e).  And

---

[1]To the extent that the Halaszes press a *Monell* claim against the school district, that claim fails because "there can be no liability under *Monell* without an underlying constitutional violation."  *Martinez v. Wayne County*, 142 F.4th 828, 844 (6th Cir. 2025) (citation modified).

Michigan courts recognize that "[t]he operation of a public school is a governmental function." *Stringwell v. Ann Arbor Pub. Sch. Dist.*, 686 N.W.2d 825, 827 (Mich. Ct. App. 2004). Because the school district is a governmental agency performing a governmental function, it is immune from any of the Halaszes' tort claims.

### B. Negligence

Next, we consider the Halaszes' negligence claim against the individual defendants. For negligence actions, governmental employees are immune from suit if: (1) they were acting or reasonably believed that they were acting within their scope of authority, (2) the governmental agency was engaged in the exercise or discharge of a governmental function, and (3) the individual defendant's conduct did not amount to gross negligence. Mich. Comp. Laws § 691.1407(2); *Odom v. Wayne County*, 760 N.W.2d 217, 228 (Mich. 2008).

The individual defendants are entitled to immunity from the Halaszes' negligence claim. It is undisputed that the individual defendants acted within their scope of authority, and that their employer, the school district, was engaged in the discharge of a governmental function. That leaves the gross-negligence element. "'Gross negligence' means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." Mich. Comp. Laws § 691.1407(8)(a). "Although questions regarding whether a governmental employee's conduct constituted gross negligence are generally questions of fact for the jury," *Wood v. City of Detroit*, 917 N.W.2d 709, 714 (Mich. Ct. App. 2018), the Halaszes have pointed to no record evidence creating a jury question. They just make the conclusory assertion that a question of fact exists.

### C. Intentional Infliction of Emotional Distress

The Halaszes' intentional-infliction-of-emotional-distress claim against the individual defendants fails as well. Governmental employees are entitled to immunity from intentional torts if they: (1) acted or reasonably believed that they were acting within their scope of authority, (2) undertook their actions in good faith, and not maliciously, and (3) exercised their own judgment or discretion in their actions. *Odom*, 760 N.W.2d at 228.

Like with their negligence claim, the Halaszes offer nothing to create a genuine dispute of fact about whether the individual defendants acted within the scope of their authority, in good faith, and in a discretionary manner.  Thus, the individual defendants are entitled to immunity.

**V.**

For these reasons, we **AFFIRM** the district court's judgment.