# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-3280
_____

T.S.H.; M.J., Next friend of H.R.J., a minor,

*Plaintiffs - Appellees*,

v.

Clarence Green; Anthony Williams,

*Defendants - Appellants*.
_____

Appeal from United States District Court
for the Western District of Missouri - St. Joseph
_____

Submitted: November 19, 2020
Filed: May 11, 2021
_____

Before COLLOTON, MELLOY, and KELLY, Circuit Judges.
_____

COLLOTON, Circuit Judge.

Clarence Green and Anthony Williams, police officers at Northwest Missouri State University, investigated a report of misconduct by high school students attending a summer camp on the university campus. Green was the chief of police; Williams was an officer in the department. The students sued the officers for

allegedly violating certain statutory and constitutional rights during the investigation. The officers moved to dismiss the claims against them, arguing that they were entitled to qualified immunity. The district court denied the motion, but we come to a different conclusion and therefore reverse.

I.

In June 2016, two high school students who are identified by their initials, T.S.H. and H.R.J., attended a high school football camp at the University. They stayed in a dormitory and received instruction from university coaches, but were supervised by their high school coach. At the time same, the University also hosted a high school cheerleading camp, and participants resided in a neighboring dormitory. In reciting what transpired, we assume for analysis that the facts alleged in the complaint are true.

During the camps, a female cheerleading coach reported to residence assistants that she had seen people in a nearby window observing her, and possibly photographing her, while she undressed in a dormitory room. The residence assistants contacted Officers Green and Williams with the University Police. The officers investigated and inferred that the window in question belonged to one of two dormitory rooms that were assigned to seven football camp participants. According to the students, the officers created an "offense report" that included the students' names.

The students allege that Officer Williams directed their high school coach to gather the seven players in a room and hold them there "for interrogation" about the incident. Acting at the officers' direction, "and in submission to their perceived authority as law enforcement officers," the coach assembled the players and told them they were being investigated. The coach allegedly kept the players in the room "for a period of hours," questioned them, and asked to see photographs on their cell

phones. The players revealed this information "[i]n submission to the perceived authority" of the officers. When no one confessed, the players were expelled from the camp.

T.S.H. and H.R.J. sued Green and Williams under 42 U.S.C. § 1983. The students claim that the officers violated their rights against unreasonable seizures under the Fourth and Fourteenth Amendments. Specifically, the students assert that they were subjected to an unlawful seizure, because their coach "confined" them at the officers' direction. The students also allege that the officers denied them certain statutory rights to due process and privacy that are accorded to juveniles in federal delinquency proceedings. *See* 18 U.S.C. §§ 5033, 5038. Finally, the students claim that the officers conspired to violate their civil rights.

The officers moved to dismiss the complaint based on qualified immunity. The district court concluded, however, that the students adequately alleged violations of clearly established constitutional and statutory rights. Reasoning that qualified immunity could not be established "on the face of the complaint," *Bradford v. Huckabee*, 330 F.3d 1038, 1041 (8th Cir. 2003), the court denied the motion to dismiss. The officers appeal, and we have jurisdiction to consider their interlocutory appeal addressing purely legal issues. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

II.

State actors are entitled to qualified immunity from suits under 42 U.S.C. § 1983 "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). A right is "clearly established" if "every reasonable official" would have known the conduct was unlawful at the time of the alleged violation. *Id.* at 589-90. A reviewing court must not define clearly established law at a "high level

of generality," because that approach "avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id*. at 590 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). "[S]pecificity of the rule is especially important in the Fourth Amendment context." *Id*. (internal quotation omitted).

We review *de novo* the denial of a motion to dismiss based on qualified immunity. Because the appeal arises from a ruling on a motion to dismiss, we accept as true all of the complaint's factual allegations and view them in the light most favorable to the plaintiffs. *Stodghill v. Wellston Sch. Dist.*, 512 F.3d 472, 476 (8th Cir. 2008).

### A.

The officers first argue they are entitled to qualified immunity on the Fourth Amendment claim. The Fourth Amendment protects citizens from "unreasonable searches and seizures." U.S. Const. amend. IV. The appeal presents two issues through the lens of qualified immunity: whether the officers seized the students and, if so, whether the seizure was reasonable.

On the question of seizure, the students allege that the officers "instructed" their coach to confine the students to a room and question them about the incident. "Consistent with the instructions of Green and Williams, and in submission to their perceived authority," the coach then confined the students to a dorm room. The students claim that their coach "was acting at the behest of" and "following the instructions of" the officers throughout the confinement. And the students allege that they, too, acted "[i]n submission to the perceived authority" of the officers.

Because the officers allegedly knew that the coach carried out the seizure at their direction, and because the coach allegedly intended to assist the officers, we will

-4-

assume for the sake of analysis that the coach was acting as an agent of the officers. *See United States v. Ringland*, 966 F.3d 731, 735 (8th Cir. 2020). Because the students claim that they submitted to the officers' authority, we will also assume that they were seized within meaning of the Fourth Amendment.

Even so, the officers argue, any seizure was reasonable, or at least they reasonably believed that was the case. They contend that the students, on these alleged facts, had no clearly established right to be free from seizure by school officials acting at the behest of university police. As this court has observed, "in the public school context, children have a diminished expectation of privacy, and this expectation becomes even more diminished for school children engaged in extracurricular activities and athletics." *Barrett v. Claycomb*, 705 F.3d 315, 323 (8th Cir. 2013).

A school official need not have probable cause to search a student in a school; "[r]ather, the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985). A student search is reasonable if it is "justified at its inception," and "reasonably related in scope to the circumstances which justified the interference in the first place." *T.L.O.*, 469 U.S. at 341 (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)).

The law is not settled on whether the same reasonableness inquiry applies to student seizures, *see K.W.P. v. Kan. City Pub. Schs.*, 931 F.3d 813, 822 (8th Cir. 2019), but there is no clearly established law to the contrary. At least one circuit has concluded that the reasonableness standard from *T.L.O.* applies to student seizures. *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1304 (11th Cir. 2006). This court and the Ninth Circuit have reserved judgment on whether to apply *T.L.O.* or the objective reasonableness standard from *Graham v. Connor*, 490 U.S. 386 (1989). *K.W.P.*, 931 F.3d at 926; *C.B. v. City of Sonora*, 769 F.3d 1005, 1029-30 (9th Cir.

2014) (en banc). Given the state of the law, a reasonable officer could have proceeded on the understanding that a student seizure is permissible if it is reasonable under the standard of *T.L.O.*

Although the alleged seizure in this case did not occur at the high school and was initiated by law enforcement, reasonable officers could have believed that probable cause was not required. We have applied the reasonableness standard to searches of high school students outside of "traditional school grounds," because the "nature of administrators' . . . responsibilities for the students entrusted to their care, not school boundary lines, renders the Fourth Amendment standard in the public-school context less onerous." *Shade v. City of Farmington*, 309 F.3d 1054, 1061 (8th Cir. 2002).

*T.L.O.* left open whether the reasonableness test should apply to actions "conducted by school officials in conjunction with or at the behest of law enforcement agencies," 469 U.S. at 341 n.7, but our decision in *Shade* applied the reasonableness standard where both school officials and law enforcement officers were involved. 309 F.3d at 1060. Although school officials initiated the search in *Shade*, other courts have applied the reasonableness standard to student seizures effected at the behest of police. An example is *Milligan v. City of Slidell*, 226 F.3d 652 (5th Cir. 2000), where police officers had students called out of class for questioning about a rumored fight, and the court measured the reasonableness of the "seizure" in light of the "lesser expectation of privacy" enjoyed by students in the school environment. *Id*. at 655-56.

Given that Green and Williams were employed by the University Police, it is also noteworthy that searches conducted by school police or school liaison officers have been evaluated under a reasonableness standard. *See People v. Dilworth*, 661 N.E.2d 310, 317 (Ill. 1996); *Commonwealth v. J.B.*, 719 A.2d 1058, 1060, 1062 (Pa. Super. Ct. 1998). We recently rejected an argument that clearly established law

required "probable cause" before a school resource officer could summon a high school student to the school office for interrogation about an alleged sexual assault. *L.G. v. Columbia Pub. Schs.*, No. 20-2161, 2021 WL 1030977, at *2-3 (8th Cir. Mar. 18, 2021). In light of these decisions, the students had no clearly established right to be free from a seizure instigated by Green and Williams if it passed muster under a standard of reasonableness.

Under the facts alleged here, we further conclude that a reasonable officer could have believed that the seizure was reasonable. When the principles of *T.L.O.* are applied to this context, a seizure is "justified at its inception" if there are reasonable grounds to believe that "the student has violated or is violating either the law or the rules of the school." 469 U.S. at 342. A seizure is reasonable in scope if it is "reasonably related to the objectives" of the investigation and not excessive in light of the student's characteristics and the nature of the alleged infraction. *Id.* There were sufficient grounds on these facts to place the officers' action at least within the gray area for which qualified immunity is available.

On justification for the seizure, the students allege that the officers described the cheerleading coach's allegation as a "possible Title IX incident." Title IX is a federal statute that prohibits discrimination on the basis of sex in "any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). But the students contend that because the cheerleading coach was neither a student nor an employee of the University, there was thus no reasonable justification under Title IX for the seizure. They argue that the officers were attempting instead to "prove the commission of a crime," such as invasion of privacy under Missouri law. *See* Mo. Rev. Stat. § 565.252.1(1).

We think a reasonable officer could have believed that either basis justified an investigatory seizure. Under then-applicable Title IX guidance, a school with knowledge of "student-on-student harassment that creates a hostile environment" was

required "to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects." Dep't of Educ., Off. for C.R., Dear Colleague Letter (Apr. 4, 2011), at 4. The same guidance said that "Title IX also protects third parties from sexual harassment . . . in a school's education programs and activities," and included the example of "a visitor in a school's on-campus residence hall." *Id.* at 4 n.11. Based on the report of the cheerleading coach who was housed in the University's dormitory, the officers reasonably could have believed that they were authorized to investigate the incident to comply with the prevailing Title IX guidance.

So too with a possible violation of Missouri law. A person commits the offense of invasion of privacy if he photographs another person, without her consent, while she is in a state of full or partial nudity and is in a place where one would have a reasonable expectation of privacy. Mo. Rev. Stat. § 565.252.1(1). Reasonable officers could have believed that the cheerleading coach's report gave reasonable grounds to suspect that questioning the students would turn up evidence about invading the privacy of the cheerleading coach.

Finally, the seizure must have been reasonable in scope. The students claim that they were "not free to leave for a period of hours." Other courts, however, have found student seizures of similar durations to be reasonable. In *Shuman ex rel. Shertzer v. Penn Manor School District*, 422 F.3d 141 (3d Cir. 2005), the court held that a student seizure lasting around four hours was reasonable for an investigation of possible sexual misconduct. *Id.* at 149. In *Stockton v. City of Freeport*, 37 F. App'x 712 (5th Cir. 2002), police detained students for "several hours" at a municipal building after a threatening letter was found in a computer room at their high school. The students here identify no authority placing a more precise limitation on the duration of a seizure for questioning in a school-related environment. In light of this authority, we conclude that the students had no clearly established right to be free from a seizure that extended for a period of hours.

In sum, it was reasonable for Officers Green and Williams to believe that a seizure of high school students by a high school coach acting at the behest of the officers was permissible if reasonable. It was also reasonable for the officers to believe that the seizure was justified under that standard. The officers thus did not violate the students' clearly established rights under the Fourth Amendment, so they are entitled to qualified immunity on this claim.

B.

The officers argue that they are also entitled to qualified immunity on the statutory claims brought by the students. The students maintain that 18 U.S.C. § 5033 "provides specific due process rights for juveniles who have been 'seized' in connection with a criminal investigation." They also contend that the officers violated their "right to privacy" by disclosing certain information in violation of 18 U.S.C. § 5038.

The two statutes at issue concern juvenile delinquency proceedings under federal law. "Juvenile delinquency" is a violation of federal law committed by a person under the age of eighteen "which would have been a crime if committed by an adult." 18 U.S.C. § 5031. If a juvenile arrestee is not surrendered to state authorities, then the Attorney General must certify "that there is a substantial Federal interest in the case" before "any proceedings against" the juvenile may occur in federal court. *Id.* § 5032.

Federal law provides additional protections for defendants in juvenile delinquency proceedings. Before a juvenile who is "taken into custody for an alleged act of juvenile delinquency" may appear before a federal magistrate judge, officers must "advise such juvenile of his legal rights" and notify both the juvenile's parents and the Attorney General of the arrest. *Id.* § 5033. The name of the arrested juvenile

must not "be made public in connection with a juvenile delinquency proceeding" unless he is prosecuted as an adult. *Id.* § 5038(e).

The statutes cited by the students are not applicable here. The students were not charged with a federal crime. There was no appearance before a magistrate judge and no juvenile delinquency proceeding that triggered the statutory protections or procedures. The officers are thus entitled to dismissal on these claims.

C.

The officers also contend that the district court should have dismissed the students' claim alleging a conspiracy to violate civil rights. To prove a civil rights conspiracy, a plaintiff must show that a defendant conspired with others to deprive him of a constitutional right. *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999). If a reasonable officer could believe he was acting lawfully as an individual, then he also could believe that he was acting lawfully by working with a colleague toward the same end. *See Hale v. Townley*, 45 F.3d 914, 920-21 (5th Cir. 1995); *cf. Ziglar v. Abbasi*, 137 S. Ct. 1843, 1868-69 (2017). Because Green and Williams reasonably believed that they were acting lawfully, they violated no clearly established constitutional right by acting in concert on their investigation. The officers are thus entitled to qualified immunity on the conspiracy claim.

\*     \*     \*

For the foregoing reasons, we reverse the district court's order denying qualified immunity and remand with directions to dismiss the claims against Green and Williams.

-10-

KELLY, Circuit Judge, concurring in part and dissenting in part.

Because I believe T.S.H. and H.R.J. have stated a plausible claim for violation of their Fourth Amendment rights, I respectfully dissent. See Hafley v. Lohman, 90 F.3d 264, 266 (8th Cir. 1996) ("Dismissal is inappropriate unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." (cleaned up)). Assuming the standard articulated in New Jersey v. T.L.O., 469 U.S. 325 (1985), applies to a seizure of high school students carried out by their football coach at the behest of law enforcement and away from traditional school grounds,[1] I disagree with the court's conclusion that the seizure at issue here was reasonable.

Under the T.L.O. standard, we must evaluate both whether the seizure was "justified at its inception" and whether it "was reasonably related in scope to the circumstances which justified [it] in the first place." 469 U.S. at 341 (cleaned up) (quoting Terry v. Ohio, 392 U.S. 1, 20 (1968)). As an initial matter, it bears emphasizing that "T.L.O.'s two-part test in the school setting operates as a limited 'special needs' exception to the warrant and probable cause requirements of the Fourth Amendment." Scott v. County of San Bernardino, 903 F.3d 943, 949 (9th Cir. 2018) (citing Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 653 (1995)); see also Schulkers v. Kammer, 955 F.3d 520, 537 (6th Cir. 2020) (describing the special needs doctrine). That is, it is based on the principle that "[a] search unsupported by probable cause can be constitutional . . . 'when special needs, beyond the normal need

---

[1]Though I am not necessarily convinced that the T.L.O. standard applies under these circumstances, it was clearly established in 2016 that reasonableness is the minimum standard governing the officers' conduct. Cf. Reynolds v. City of Anchorage, 379 F.3d 358, 372-73 (6th Cir. 2004) (Moore, J., dissenting) (explaining that "when confronted with a search . . . initiated by law enforcement officers not under the supervisory control of school authorities, courts have uniformly held that probable cause is required," and collecting cases to that effect).

for law enforcement, make the warrant and probable-cause requirement impracticable.'" Acton, 515 U.S. at 653 (quoting Griffin v. Wisconsin, 483 U.S. 868, 873 (1987)). As pertinent here, courts have recognized that students' "Fourth Amendment rights . . . are different in public schools than elsewhere. . . . because schools have a legitimate need to maintain an environment in which learning can take place." Burlison v. Springfield Pub. Schs., 708 F.3d 1034, 1039 (8th Cir. 2013) (cleaned up); see also Acton, 515 U.S. at 653 (explaining that the reasonableness standard applies in public schools because traditional Fourth Amendment requirements "would unduly interfere with the maintenance of . . . swift and informal disciplinary procedures" and "would undercut the substantial need of teachers and administrators for freedom to maintain order in the schools" (cleaned up)).

Turning to the first part of the T.L.O. test, "a search of a student by a teacher or other school official will" generally "be justified at its inception when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." 469 U.S. at 341-42 (cleaned up). In concluding that the seizure here was justified as part of a possible Title IX investigation, the court—in my view—fails to construe the Amended Complaint in the light most favorable to T.S.H. and H.R.J. The students allege that "at no time during [their] confinement and interrogation was the NWMSU Title IX investigation officer informed of this matter." This allegation suggests that the university employed a "Title IX investigation officer" to initiate and oversee such investigations during the relevant period. See 34 C.F.R. § 106.8(a) ("Each recipient [of federal funds] must designate and authorize at least one employee to coordinate its efforts to comply with its responsibilities under [Title IX], which employee must be referred to as the 'Title IX Coordinator.'"). The failure to notify the university's Title IX officer of the incident, together with the fact that the officers described the cheerleading coach's allegation as only a "possible Title IX incident," implies that the cheerleading coach did not file a formal Title IX complaint and thus, that the officers

-12-

knew no formal investigation or grievance process had been triggered. See id. §§ 106.8(c), .45(b).

Although a university may still initiate "an informal resolution process" absent a formal complaint, the regulations make clear that this informal process requires, among other things, "the parties' voluntary, written consent." Id. § 106.45(b)(9). Here, the students adequately allege that they never consented to the seizure. And because the Amended Complaint suggests the officers made no effort to coordinate with the university's Title IX officer or to comply with Title IX regulations, there is no basis to conclude that they reasonably believed they had authority under Title IX to independently initiate an investigation and to seize and interrogate high school students. Cf. Dep't of Educ., Off. for C.R., Dear Colleague Letter (Apr. 4, 2011), at 4 ("[A] school's Title IX investigation is different from any law enforcement investigation, and a law enforcement investigation does not relieve the school of its independent Title IX obligation to investigate the conduct."); Plamp v. Mitchell Sch. Dist. No. 17-2, 565 F.3d 450, 459 (8th Cir. 2009) (explaining that although school staff have "the authority, if not the duty, to report" potential Title IX violations to "the school administration or school board," such "authority does not amount to an authority to take a corrective measure or institute remedial action" under the statute).

Nor was the seizure here justified by any "reasonable grounds" to suspect that T.S.H. and H.R.J. had violated Missouri law. See T.L.O., 469 U.S. at 342. As the court notes, the students contend that the "purpose of the officers' investigation was to prove" that the students had invaded the cheerleading coach's privacy. See Mo. Rev. Stat. § 565.252.1(1) (2017). According to the Amended Complaint, the cheerleading coach wrote in an incident report that (1) she saw "several figures in a couple different windows" who seemed to be "looking straight at her" and (2) she thought she saw a phone "to take pictures." Aside from this, the officers knew only that T.S.H. and H.R.J. were among seven students assigned to rooms in Tower Suites West—a building the students allege to be "quite some distance away" from the

-13-

cheerleading coach's dormitory—which could have been the rooms in which the cheerleading coach saw the "figures." With no other evidence linking T.S.H. and H.R.J. to the incident, it was unreasonable for the officers to suspect that they were the people the cheerleading coach saw in the dormitory windows, that they were holding the phone she thought she saw, or that they actually took any photo at all.

Finally, the Amended Complaint suggests that T.S.H. and H.R.J. were seized, questioned, and searched in furtherance of an ordinary criminal investigation, rather than a "special need" to maintain an appropriate learning environment, facilitate the imposition of informal school discipline, or maintain order and safety in a school setting. See, e.g., Am. Compl. ¶¶ 51-53 (describing how the officers—and not the students' coach—initiated the investigation); id. ¶ 55 (alleging that the football coach was acting pursuant to the officers' instructions when he told the students they were being investigated for committing a crime); id. ¶ 64 (alleging that one of the officers prepared an Offense Report based on the investigation that ultimately concluded that no one would face criminal charges). According to the Amended Complaint, the cheerleading coach did not report the incident—which had occurred the previous evening—until she checked out of her dormitory room. From this, it is reasonable to infer that the cheer camp had ended, that there was no risk of students engaging in future similar conduct, and thus, that there was no special need to restore order or safety. At base, an officer's seizure of a student is not reasonable "'where the officer's purpose is not to attend to the special need' in question." Scott, 903 F.3d at 950 (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 737 (2011)).

Moving to the second prong of the T.L.O. test, even if the seizure was justified at its inception, it was not "reasonably related in scope to the circumstances which justified the interference in the first place." T.L.O., 469 U.S. at 341. A seizure "will be permissible in its scope when the measures adopted are reasonably related to the objectives of the [seizure] and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." Id. at 342. In response to the students'

claim that they were detained for "a period of hours," the court today reasons that "student seizures of similar durations" have been found permissible in the past. In my view, this approach fails to balance the duration of this particular seizure with the nature of the infraction. This is evidenced by the examples the court cites: one case involving forced sexual contact, Shuman ex rel. Shertzer v. Penn Manor Sch. Dist., 422 F.3d 141 (3d Cir. 2005), and another involving a threatening letter found in a high school three days after the high school shooting in Columbine, Stockton v. City of Freeport, 37 Fed. App'x 712 (5th Cir. 2002). In both, the perpetrators were easily and readily identified. And in both, the nature of the alleged conduct warranted an immediate response to avoid disruption in the school or harm to other students. Here, by contrast, there was no imminent risk of harm or disruption. The officers merely suspected that one or more students among a group of seven, standing in a completely different building, might have watched the cheerleading coach undress and might have taken a picture. The invasion of the coach's privacy is, of course, concerning if true, but it is not sufficiently comparable to the alleged misconduct in Shuman and Stockton.

Considering the absence of a security threat and the lack of any apparent disruption to the camps or to the students' learning environment, it was unreasonable for the officers to believe that the hours-long detention and interrogation of T.S.H. and H.R.J. were warranted. Compare Doe ex rel. Doe v. Little Rock Sch. Dist., 380 F.3d 349, 355 (8th Cir. 2004) (concluding that "highly intrusive" searches of students' persons and belongings violated the Fourth Amendment where "government officials conducting the searches [were] in large part playing a law enforcement role with the goal of ferreting out crime and collecting evidence"), with Burlison, 708 F.3d at 1036, 1040-41 (concluding that the "brief separation" of the student and his belongings during a drug dog exercise was reasonable, especially in light of "substantial evidence showing there was a drug problem in district buildings").

For these reasons, I would affirm the district court's denial of the motion to dismiss the students' Fourth Amendment claims and, consequently, their civil rights conspiracy claim as well. Otherwise, I concur in the court's opinion with respect to the students' claims brought under 18 U.S.C. §§ 5033 and 5038(c).

_____