# United States Court of Appeals

## For the Eighth Circuit

_____

No. 21-3269

_____

Jane Doe, individually and on behalf of their minor child, A.A.; John Doe, individually and on behalf of their minor child, A.A.; Jessica Doe, individually and on behalf of their minor child, B.B.; Jill Doe, individually and on behalf of their minor child, C.C.; Jeff Doe, individually and on behalf of their minor child, C.C.; Janet Doe, individually and on behalf of her minor child, D.D.; Julie Doe, individually and on behalf of her minor child, E.E.

*Plaintiffs - Appellees*

James Doe, individually and on behalf of their minor child, B.B.

*Plaintiff*

v.

Aberdeen School District

*Defendant*

Becky Guffin, in her individual and official capacity; Camille Kaul, in her individual and official capacity; Renae Rausch, in her individual and official capacity; Colleen Murley, in her individual and official capacity; Michael Neubert, in his individual and official capacity; Carrie Weisenburger, in her individual and official capacity

*Defendants - Appellants*

_____

Appeal from United States District Court
for the District of South Dakota - Northern

_____

Submitted: May 11, 2022
Filed: August 1, 2022

_____

Before ERICKSON, MELLOY, and KOBES, Circuit Judges.

_____

ERICKSON, Circuit Judge.

This case involves allegations that Carrie Weisenburger restrained, secluded, and abused her students as a teacher in a special education classroom. The students' parents sued Weisenburger, along with Aberdeen School District ("ASD") and a host of its administrative officials, on their children's behalf under 42 U.S.C. § 1983. The district court denied Weisenburger's assertion of qualified immunity from claims for infringing the Fourth and Fourteenth Amendment rights of three students, identified as A.A., B.B., and C.C. We affirm in part and reverse in part.

## I.   BACKGROUND

The facts remain disputed, but we recount them in the light most favorable to the students at this stage. See Walton v. Dawson, 752 F.3d 1109, 1114 n.1 (8th Cir. 2014).

Throughout the 2014-2015 and 2015-2016 school years, Weisenburger taught in the Enrich II classroom at May Overby Elementary School. A.A., B.B., and C.C. attended her class for third and fourth grades. Each child is a student with disabilities who had an individualized education program ("IEP") in effect. While the students vary in their ability to communicate, none could vocalize their daily experiences in school to others.

A.A. has been diagnosed with both autism spectrum disorder and moderate cognitive disability. A behavior intervention plan signed by her mother on October 15, 2015 recorded that A.A. had run away from recess and academic settings, acted

-2-

aggressively toward her peers, refused to comply with teacher directions, and often distracted her classmates.

Most of the allegations about A.A.'s mistreatment stem from Weisenburger's use of the "little room." The little room measures 10 feet by 10 feet and is situated in a different part of the school than the Enrich II classroom, just off the gymnasium. There is a window on the door and a small table, a whiteboard, and cupboards inside. May Overby staff employed the room for purposes ranging from a calm-down space to Title I instruction to tutoring.

On a regular basis, Weisenburger and her two teaching aides physically picked up and carried students—who sometimes resisted by kicking and screaming—from class to the little room. Once there, students had to demonstrate calm behavior and complete several "task baskets" unrelated to whatever disciplinary infraction led to their visit before they were permitted to leave. Either Weisenburger or an aide would wait outside and hold the door shut until they gained compliance. Students sat in the little room for up to hours at a time, with a few instances extending to as long as an entire afternoon.

According to a "frowny face" journal shown to A.A.'s mother, Weisenburger and her aides placed A.A. in the little room 274 times between October 26, 2015 and March 1, 2016. Weisenburger sent A.A. to the little room for rule breaking as minor as incorrectly hanging up her coat and pushing a cabinet. A handwritten amendment to A.A.'s behavior plan dated February 4, 2016 stated: "If necessary, staff can take [A.A.] up to the Little Room . . . so she is not a disruption to other students and she is not getting attention from others." A.A.'s mother acknowledged consenting to placement in the little room but said Weisenburger told her the space would be for one-on-one instruction rather than discipline.

B.B. has been diagnosed with autism and attention deficit hyperactivity disorder. An unsigned behavior intervention plan imposed in February 2016

documented that he would repeat movie quotes or run to the bathroom to avoid following directions from staff. B.B.'s mother denied seeing or signing the plan.

The allegations regarding B.B. are more varied. Weisenburger and her aides physically confined B.B. using dividers in an atrium adjacent to the classroom called the "calm-down corner." Although students could technically leave the calm-down corner, staff stood nearby to make them stay. Weisenburger also repeatedly dragged B.B. to gym class despite his protests and once lifted him under his armpits to force his participation in a game. In another incident, B.B. refused to swim when the class went to the pool. Weisenburger and her aides grabbed B.B.'s arms and pushed him into the water. As B.B. frantically tried to climb out, an aide pried his fingers from the edge and shoved him back into deeper water.

C.C. has been diagnosed with moderate to severe inner ear hearing loss. An unsigned behavior intervention plan imposed in December 2015 reported that he would refuse to comply with directions "by just sitting at his desk or on the carpet." C.C.'s mother denied seeing or signing the plan.

The allegations underlying C.C.'s claims derive from two specific incidents. First, when C.C. refused to change for swimming, Weisenburger pinned him on the ground, forcibly stripped his clothes off, and put on his bathing suit. C.C. screamed so loudly that a concerned adult walked into the locker room to check on whoever had yelled. Second, staff purportedly forced him to ride a horse while he was kicking and screaming. The teachers later learned that C.C. had been in pain from blocked ear tubes at the time.

Multiple generalized claims of physical and verbal abuse appear in the record as well. Weisenburger would grab students by the chin and tell them to "look at me when I'm talking to you." And staff handled children roughly, "grabbing arms and then jerking them around," which was "usually accompanied by chasing the child." Weisenburger frequently made demeaning remarks about students and their parents. In response to an aide addressing a student, she said while laughing, "Oh you are so

-4-

cute talking to them like they understand you." She commented on the smell of one student who had toileting issues and would check the girl's underwear in front of the whole class while referring to her parents as "drug users and losers." There was "a lot of yelling and shouting at the kids."

C.C.'s sign language interpreter, Ava Weixel (formerly Solberg), made some of these allegations to ASD Special Education Director Camille Kaul in April 2015. Kaul investigated but deemed the accusations unfounded. In January 2016, after the two aides separately expressed additional concerns, Kaul and May Overby Principal Michael Neubert placed Weisenburger on an assistance plan due to "the support staff not knowing what to do to address inappropriate behaviors." Less than three months later, A.A.'s mother witnessed Weisenburger and her aides push B.B. into the pool. She sent a cell phone video of the incident to Kaul. In response, Kaul wrote a memo to Weisenburger to convey her "concerns regarding restraints used with a student in the Enrich classroom." Kaul went on to command: "As I have instructed you before, restraint is to only be used as a last resort and only if the student is a harm to himself or at risk to harm others. Restraints should never be used to gain compliance." Kaul also reminded Weisenburger that "during the past school year" all staff in the Enrich II classroom had completed training through the Crisis Prevention Institute ("CPI") on when and how to use restraint and seclusion methods. The memo concluded by giving notice "that this is your final written warning concerning the improper use of restraints with students." Weisenburger and her aides soon resigned.

Following the resignations, Weixel met with A.A.'s mother over the summer to disclose the full extent of what had happened in the Enrich II classroom. In turn, A.A.'s parents reported the allegations to a disability rights advocacy agency, which then submitted a civil rights complaint. A joint investigation by the Departments of Justice and Education directly mentioned the little room and calm-down corner when determining that "various school personnel were utilizing seclusion as a disciplinary measure to routinely address behaviors that were a manifestation of a disability."

The students' parents initiated this lawsuit under 42 U.S.C. § 1983, asserting violations of their children's Fourth and Fourteenth Amendment rights. In addition, the plaintiffs advanced claims under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.; the Rehabilitation Act of 1973, 29 U.S.C. § 794 et seq.; the South Dakota Human Rights Act, S.D. Codified Laws § 20-13-1 et seq.; and common-law negligence. All the individually named defendants invoked qualified immunity and moved for summary judgment on the § 1983 claims. The district court rejected the motion as to Weisenburger but appeared to dismiss the constitutional claims against the remaining ASD administrators.[1] The defendants bring this interlocutory appeal. See Mitchell v. Forsyth, 472 U.S. 511, 530 (1985).

## II.    DISCUSSION

We review *de novo* the district court's denial of a summary judgment motion based on qualified immunity. Williams v. City of Burlington, 27 F.4th 1346, 1350 (8th Cir. 2022). Qualified immunity shields state officials from liability unless their "actions violated constitutional or statutory rights that were clearly established at the time of the violation." Perry v. Adams, 993 F.3d 584, 587 (8th Cir. 2021). First, we ask whether the facts, construed in the light most favorable to the plaintiffs, reveal a deprivation of a federal constitutional or statutory right. Bell v. Neukirch, 979 F.3d 594, 602 (8th Cir. 2020). Second, we ask whether that right was clearly established when the deprivation occurred. Id. We may begin and resolve the analysis on either question. Just v. City of St. Louis, 7 F.4th 761, 766 (8th Cir. 2021).

### A.    Unreasonable Seizures

The Fourth Amendment's prohibition on unreasonable searches and seizures extends to public school officials. Burlison v. Springfield Pub. Schs., 708 F.3d 1034, 1039 (8th Cir. 2013). A seizure happens when, in view of all the circumstances, "a

---

[1]The district court dismissed similar § 1983 claims by two other students, D.D. and E.E., as time barred. Several claims not at issue in this appeal survived summary judgment, including municipal liability claims against ASD itself.

-6-

reasonable person would have believed that he was not free to leave." <u>Michigan v. Chesternut</u>, 486 U.S. 567, 573 (1988). Yet "seizure of a public school student by a teacher must be evaluated in the context of the school environment, where restricting the liberty of students is a *sine qua non* of the educational process." <u>Wallace ex rel. Wallace v. Batavia Sch. Dist. 101</u>, 68 F.3d 1010, 1013-14 (7th Cir. 1995). Of course, students do not "shed their constitutional rights . . . at the schoolhouse gate," <u>Tinker v. Des Moines Indep. Cmty. Sch. Dist.</u>, 393 U.S. 503, 506 (1969), but "the nature of those rights is what is appropriate for children in school," <u>Vernonia Sch. Dist. 47J v. Acton</u>, 515 U.S. 646, 656 (1995). A school seizure requires that a "limitation on the student's freedom of movement must significantly exceed that inherent in every-day, compulsory attendance." <u>Couture v. Bd. of Educ. of Albuquerque Pub. Schs.</u>, 535 F.3d 1243, 1251 (10th Cir. 2008).

We believe secluding A.A. in the little room and B.B. in the calm-down corner constituted seizures. In <u>Couture</u>, the Tenth Circuit noted that a child "was certainly subject to greater restrictions than are most students" because he had been "at times physically carried into" a small "timeout room, where teachers shut and barricaded the door," while his "requests for release from the room were consistently denied." <u>Id.</u> Likewise here, Weisenburger and her aides picked up and carried A.A. into the little room, held the door shut, and forbade her from leaving until she completed tasks unrelated to any disciplinary violation. Staff also shuttered B.B. in the calm-down corner with physical barriers and prevented him from leaving. We emphasize that an ordinary school timeout is not a Fourth Amendment seizure. To reiterate, the restriction on liberty "must significantly exceed" what a child usually confronts in a public educational setting. <u>Id.</u> The combination presented here—dragging students, confining them in locked or barricaded areas, and barring them from leaving on pain of further physical intervention—exceeds that demanding threshold. Weisenburger curtailed A.A. and B.B.'s movement severely enough to implicate the Constitution.

Grabbing B.B. to push him into the swimming pool and pinning C.C. down to strip his clothes off also rose to the level of seizures. An analogous decision is <u>Doe ex rel. Doe v. Hawaii Department of Education</u>, 334 F.3d 906, 909 (9th Cir. 2003),

in which the Ninth Circuit held that a vice principal seized a second grader by taping the boy's head to a tree for five minutes. Weisenburger, too, forcibly restrained B.B. and C.C. for appreciable periods of time in ways that went beyond normal limitations on public school students. Cf. Torres v. Madrid, 592 U.S. ___, 141 S. Ct. 989, 1003 (2021) (holding that "application of physical force to the body of a person with intent to restrain is a seizure"). That said, the remaining allegations fall short of seizures. Keeping C.C. atop a horse and carrying B.B. to gym class are not radically different than what a typical student might experience. Teachers sometimes encourage upset students to persist with activities or lead them by a hand when noncompliant. Claims that Weisenburger grabbed the students' chins and arms reflect only the "momentary use of physical force by a teacher in reaction to a disruptive or unruly student," which does not amount to a Fourth Amendment seizure. Gottlieb ex rel. Calabria v. Laurel Highlands Sch. Dist., 272 F.3d 168, 172 (3d Cir. 2001).

The question now becomes whether the qualifying seizures were reasonable. See Elkins v. United States, 364 U.S. 206, 222 (1960) (stating that "the Constitution forbids . . . not all searches and seizures, but unreasonable searches and seizures"). In the public school setting, "[t]he Fourth Amendment's reasonableness inquiry . . . must account for 'the schools' custodial and tutelary responsibility' over the students entrusted to their care." Shade v. City of Farmington, 309 F.3d 1054, 1059 (8th Cir. 2002) (quoting Vernonia Sch. Dist., 515 U.S. at 656). We have explicitly held that "an authorized professional's treatment" of a student with disabilities "is reasonable if [her] actions are 'not a *substantial departure* from accepted professional judgment, practice, or standards.'" C.N. v. Willmar Pub. Schs., Indep. Sch. Dist. No. 347, 591 F.3d 624, 633 (8th Cir. 2010) (emphasis in original) (quoting Heidemann v. Rother, 84 F.3d 1021, 1030 (8th Cir. 1996)).

The professional standards applicable to Weisenburger were clearcut. In May 2012, the Department of Education promulgated guidance for the use of restraint and seclusion methods in public schools. The document provides in plain terms:

> Physical restraint or seclusion should not be used except in situations where the child's behavior poses imminent danger of serious physical harm to self or others and other interventions are ineffective and should be discontinued as soon as imminent danger of serious physical harm to self or others has dissipated. . . . Restraint or seclusion should never be used as punishment or discipline[,] . . . as a means of coercion or retaliation, or as a convenience.

The CPI protocols for restraint and seclusion, which Weisenburger received training on during the relevant timeframe, mirror the federal guidance.

Weisenburger substantially departed from accepted standards. She habitually secluded A.A. and B.B. for minor disciplinary infractions with no evidence that they posed imminent risk of harm to themselves or anyone else. And she restrained B.B. and C.C. to coerce compliance with routine directives to get in a pool and to change clothes. Unlike in C.N., where we ultimately found no Fourth Amendment violation because the child's IEP authorized the challenged restraint and seclusion techniques, none of these students' behavior intervention plans (incorporated through their IEPs) overrode the regular professional principles. B.B. and C.C.'s plans identified modest behavioral problems and never sanctioned restraint or seclusion in any form. A.A.'s plan reported more significant issues and eventually approved use of the little room. But that provides no excuse for the recurrent instances where Weisenburger secluded A.A. before her plan was amended. Importantly, the record lacks documentation of any disciplinary infractions by these students—much less the kind of violations that would call for restraint and seclusion responses. Weisenburger unreasonably seized the students in contravention of their Fourth Amendment rights.[2]

---

[2]Even if we applied the two-part reasonableness framework articulated in New Jersey v. T.L.O., 469 U.S. 325, 341 (1985), or an objective reasonableness metric as contemplated by Graham v. Connor, 490 U.S. 386, 397 (1989), we would reach the same conclusion. See T.S.H. v. Green, 996 F.3d 915, 919 (8th Cir. 2021) (explaining in the context of students without disabilities that we have reserved deciding which standard governs school seizures).

Next, we address Weisenburger's contention that the students' rights were not clearly established. A right is clearly established when its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). Although there need not be "a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." Taylor v. Barkes, 575 U.S. 822, 825 (2015) (per curiam) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)). Plaintiffs ordinarily must introduce either controlling authority or a robust consensus of persuasive authority. District of Columbia v. Wesby, 583 U.S. ___, 138 S. Ct. 577, 589-90 (2018). Still, an official "may have fair notice based on the fact his conduct is obviously unlawful, even in the absence of a case addressing the particular violation." Z.J. ex rel. Jones v. Kan. City Bd. of Police Comm'rs, 931 F.3d 672, 685 (8th Cir. 2019).

In Heidemann v. Rother, a substantive due process decision, we explained that the infringement of a disabled student's "right to freedom from bodily restraint falls within a class of constitutional claims for which 'it is nearly impossible to separate the constitutional violation analysis from the clearly established right analysis.'" 84 F.3d at 1029-30 (quoting Manzano v. S.D. Dep't of Soc. Servs., 60 F.3d 505, 510 (8th Cir. 1995)). We proceeded to hold as follows:

> [W]hen an authorized professional acting under color of state law exercises professional judgment in treating a disabled individual under the state's care, and that exercise of judgment would otherwise cause unconstitutional bodily restraint, he or she is entitled to qualified immunity if such treatment is within the scope of professionally acceptable choices, which, for purposes of judicial review, is broadly defined to include any choice that is not a *substantial departure* from accepted professional judgment, practice, or standards.

Id. at 1030 (emphasis in original). As alluded to earlier, C.N. imported Heidemann's standard into unreasonable seizure claims brought by students with disabilities. 591 F.3d at 633.

C.N. had no occasion to discuss the clearly established prong, but we conclude the analytical overlap recognized in Heidemann applies with equal force to Fourth Amendment disabled student seizure claims. It is often repeated that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). By its terms, the "substantial departure" standard ensures that only plainly incompetent professionals who forsake accepted judgment, practices, or standards will face liability for the unconstitutional seizure of a disabled student. "[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has not previously been held unlawful.'" Hope v. Pelzer, 536 U.S. 730, 741 (2002) (alteration omitted) (quoting Anderson, 483 U.S. at 640). Because Weisenburger substantially departed from accepted principles when restraining and secluding the students, she violated clearly established federal rights.

The cases Weisenburger relies on are inapposite since they uniformly involve situations where educators stayed within acceptable professional limits. See A.T. ex rel. L.T. v. Baldo, 798 F. App'x 80, 85 (9th Cir. 2019) (unpublished) (giving officials qualified immunity for use of restraint and seclusion methods beyond that authorized in IEP to mitigate "challenges presented by a severely emotionally disturbed student whose behavior poses a safety threat to others"); Payne v. Peninsula Sch. Dist., 623 F. App'x 846, 847-48 (9th Cir. 2015) (unpublished) (same for confining a child in a "safe room, as part of his aversive and behavioral intervention plan"); C.N., 591 F.3d at 627 (same for excessive restraint and seclusion of student whose IEP "authorized the use of" those methods "when [she] exhibited various target behaviors"); Couture, 535 F.3d at 1252 (same for using timeout rooms that "were expressly prescribed by [a child's] IEP as a mechanism to teach him behavioral control"); see also Miller v. Monroe Sch. Dist., 159 F. Supp. 3d 1238, 1249 (W.D. Wash. 2016); Alex G. ex rel. Dr. Steven G. v. Bd. of Trs. of Davis Joint Unified Sch. Dist., 387 F. Supp. 2d 1119, 1125 (E.D. Cal. 2005). Each decision hinged on restrictions in existing IEPs, which "set the standard for accepted practice," C.N., 591 F.3d at 633, for students showing severe and well-documented behavioral problems. Not so here. The behavior plans

-11-

for A.A. (at least until amendment), B.B., and C.C. in no way approved restraint and seclusion methods. Nor did any student present an imminent threat of harm. Given the interplay between the substantial departure inquiry and clearly established prong, Weisenburger's cited authorities shed little light on the qualified immunity analysis.

We readily acknowledge "that the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 273 (1988). But viewing the facts in the light most favorable to the students, we find four violations of clearly established Fourth Amendment rights: (1) secluding A.A. in the little room before February 4, 2016; (2) secluding B.B. in the calm-down corner using dividers; (3) grabbing B.B.'s arms to push him into the swimming pool; and (4) pinning C.C. down to strip his clothes off. Weisenburger is not entitled to qualified immunity for those violations but is for all other unreasonable seizure allegations.

## B.     Substantive Due Process

Overcoming qualified immunity on the Fourth Amendment claims diminishes the students' concurrent substantive due process claims. When an "explicit textual source of constitutional protection" exists against specific government conduct, that provision controls over the "more generalized notion of 'substantive due process.'" Soldal v. Cook Cnty., 506 U.S. 56, 70 (1992) (quoting Graham, 490 U.S. at 395). Put another way, factual circumstances "properly addressed under a Fourth Amendment analysis" cannot additionally sustain a substantive due process violation. Greenman v. Jessen, 787 F.3d 882, 891 (8th Cir. 2015); see Haw. Dep't of Educ., 334 F.3d at 908-09 (applying Graham in the student seizure context to hold that a plaintiff's claim was "appropriately brought under the Fourth Amendment, not the Due Process Clause"). That rule implements longstanding judicial reluctance to "expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992).

-12-

We made a similar distinction in <u>C.N.</u> After analyzing unreasonable seizure claims under the Fourth Amendment, we mentioned that the student had also pleaded physical and verbal abuse allegations as an excessive force theory. 591 F.3d at 634. "This circuit," we clarified, "has generally analyzed claims alleging excessive force by public school officials under the rubric of substantive due process, however, and not the Fourth Amendment." <u>Id.</u> (collecting cases). We then scrutinized the physical and verbal abuse claims using the substantive due process standard without returning to the seizure allegations. <u>Id.</u> at 634-35. The takeaway is that student unreasonable seizure claims must rise or fall under the Fourth Amendment, while school excessive force claims warrant separate review under the Due Process Clause. In consequence, the students' restraint and seclusion allegations cannot move forward as substantive due process claims.

The remaining generalized assertions of physical and verbal abuse fail to meet the high bar required for a substantive due process violation. Plaintiffs "must show that 'the behavior of the [government official was] so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" <u>Terrell v. Larson</u>, 396 F.3d 975, 978 (8th Cir. 2005) (en banc) (quoting <u>Cnty. of Sacramento v. Lewis</u>, 523 U.S. 833, 847 n.8 (1998)). The physical abuse allegations never specifically identify A.A., B.B., or C.C. as the victims. <u>See</u> <u>C.N.</u>, 591 F.3d at 634. In any event, briefly grabbing a student's chin or arm is not "so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amount[s] to brutal and inhumane abuse of official power." <u>Golden ex rel. Balch v. Anders</u>, 324 F.3d 650, 652-53 (8th Cir. 2003) (citation omitted). Also, "[v]erbal abuse is normally not a constitutional violation." <u>Doe v. Gooden</u>, 214 F.3d 952, 955 (8th Cir. 2000). Nothing in the record convinces us otherwise here. The district court erred in denying qualified immunity for Weisenburger on the students' substantive due process claims.

## C.    Supervisory Liability

Throughout most of its order, the district court seemed to dismiss supervisory liability claims against the ASD administrative officials. Its substantive due process

analysis, however, appeared to partially deny the administrators' summary judgment motion based on their deliberate indifference to Weisenburger's deprivation of the students' Fourteenth Amendment rights. We need not dwell on this discrepancy for long. Without viable substantive due process claims against Weisenburger, supervisory liability theories founded on the same conduct necessarily fail. See Mendoza v. U.S. Immigr. & Customs Enf't, 849 F.3d 408, 420 (8th Cir. 2017) (citing City of L.A. v. Heller, 475 U.S. 796, 798-99 (1986) (per curiam)). We finally note that the plaintiffs cannot challenge the dismissal of any other supervisory liability claims because they did not cross appeal, Intervarsity Christian Fellowship/USA v. Univ. of Iowa, 5 F.4th 855, 863 n.10 (8th Cir. 2021), and we would lack jurisdiction if they had done so, Mitchell v. Shearrer, 729 F.3d 1070, 1073 (8th Cir. 2013).

## III.  CONCLUSION

We affirm the denial of qualified immunity for Weisenburger on the students' Fourth Amendment claims to the extent held above. In all other respects, we reverse the denial of qualified immunity for Weisenburger and the remaining ASD officials. This matter is remanded for further proceedings consistent with this opinion.

_____